**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| VERENGO, INC.,[1] | Case No.: 16-12098 (      ) |
| Debtor. | |

**DECLARATION OF DAN SQUILLER IN SUPPORT OF THE DEBTOR'S
CHAPTER 11  PETITION AND REQUEST FOR FIRST DAY RELIEF**

Pursuant to 28 U.S.C. § 1746, Dan Squiller hereby declares as follows:

1.     I am the Chief Executive Officer of Verengo, Inc. ("**Verengo**," "**Company**," or "**Debtor**").  I perform my duties out of the Debtor's headquarters located at 20285 S. Western Ave, Torrance, CA 90501. I submit this declaration (the "**Declaration**") in support of the Debtor's chapter 11 petition and request for relief contained in certain "first day" applications and motions filed in this case on or shortly after the date hereof (the "**First Day Motions**").

2.     I have more than 30 years of experience working in various technology industries including 15 years in energy related industries.  Specifically, I have served as chief executive officer of several companies in the cleantech industry, including PowerGenix and Verengo, Inc.  I have served as the CEO of the Debtor since March 1, 2016.  I hold B.S. and M.A. degrees in electrical engineering and communications from Ohio University.

3.     As the CEO of the Debtor, I am authorized to submit this Declaration on behalf of the Debtor.  Except as indicated otherwise, all statements in this Declaration are

---

[1]     The Debtor and the last four digits of its identification number are as follows: Verengo, Inc. [6114].  The address of the Debtor's corporate headquarters is 20285 S. Western Avenue, Suite 200, Torrance, CA 90501.

based upon my personal knowledge or my review of the Debtor's books and records, or other relevant documents and information prepared or collected by the Debtor's employees.  If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein.  In making the statements herein, I have relied in part upon others to accurately record, prepare and collect necessary documentation and information.

4.      On the date hereof (the "**Petition Date**"), the Debtor commenced the case by filing voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

5.      Part I of this Declaration provides a brief overview of the Debtor and a summary of this case (as defined below).  Part II of this Declaration sets forth the relevant details of the various First Day Motions.

## I.
## BACKGROUND

### A.      Overview of the Debtor

6.      The Debtor is a privately held corporation organized under Delaware law, headquartered in Torrance, CA with warehouse operations centers in Anaheim and Valencia, CA, and an operations center in Phoenix, AZ.  The Debtor originated from Ken Button and Randy Bishop's purchase of Gemstar Builders in February 2008, which was subsequently renamed Verengo Solar, a d/b/a of Verengo, Inc.  The Debtor's business focuses on the installation of solar photovoltaic systems and is one of the most well-known and respected brands in residential solar.  The Debtor also markets and sells solar panels and semiconductor-based micro inverter systems in the United States.  As of

August 2016, the Debtor has installed 19,800 systems.  One of the Debtor's key strategic initiatives going forward is coupling energy storage with solar and the Debtor expects to be a leader in this segment by the time the market matures.

7.      Following its inception, operations were opened in California, New Jersey, New York, and Connecticut.  In February 2015, however, all northeast operations were sold to NRG Energy, Inc.; contemporaneously, Northern and Central California operations were shut down.  Notwithstanding, the Debtor remains the largest Southern California-based residential solar providers and its current business focus is California; and the Debtor's processes, operations, and supply chain are scalable for expansion into additional geographies.

8.      As previously stated, the Debtor is one of the largest pure-play installers of residential solar systems in California, the largest market by far for solar in the U.S. Through cost reductions, supply chain consolidation, and restructuring operations over the last nine months, the Debtor now has one of the industry's most competitive cost structures.  Since its inception, the Debtor achieved numerous milestones, such as the following:

- August 2012: Ranked No. 649 on Inc. 5000's list of country's fastest growing private companies
- May 2014: Clean Power Finance signed as exclusive PPA/Lease provider
- August 2014: Awarded Angie's List Super Service Award for third straight year
- January 2016: Named preferred installer for SunStreet Energy Group
- April 2016: Swell Energy signed as an Originator
- May 2016: Transition to Third-Party Model; internal sales and marketing functions eliminated
- May 2016: Complete Solar & Guaranteed Solar signed as Originators
- June 2016: Pick My Solar signed as Originator
- July 2016: 19,800[th] installation equating to over 120 MW
- July 2016: Agreements with Sungevity
- July 2016: SunGuide Solutions signed as Originator

- September 2016: Agreements with SunPower Corporation

9.      The Debtor also received two investments during that time.  The first was received in January 2011 from the Angeleno Group in the amount of $9.7 million.  The second was received in September 2013 from ClearSky Power & Technology Fund in the amount of $10 million.

10.      For the year ending December 31, 2015, the Debtor achieved $82 million in revenue and 3,170 installations.  Notwithstanding, the Debtor found itself experiencing reduced cash flow in 2016 and strained liquidity as a result.  By initiating this bankruptcy case, the Debtor seeks to preserve and capitalize on any extant value of the company by executing a sale of substantially all of its assets under 11 U.S.C. § 363.

**B.      Corporate Structure**

11.      The Debtor is structured as a corporation whose shares consist of Common and Preferred stock.  Together, Angeleno Group and ClearSky Power & Technology Fund own approximately 90% of the Company's shares, with the other 10% disbursed widely among hundreds of smaller investors, including employees of the Company.

12.      Currently the Company employees approximately 129 people (down from a high of over 1,000 in 2012).

**C.      Prepetition Capital Structure**

**(i)      Secured Loans**

13.      The Debtor had a line of credit with Bridge Bank ("**Bridge**") with a high balance of $9.3M (the "**Bridge Bank Loan**"), which balance was reduced over time. The Bridge Bank Loan was secured by all of the Debtor's rights and interest in any and all personal property, whether then existing or thereafter acquired, and all products and

proceeds thereof.  On July 15, 2016, Bridge delivered a Notice of Default to the Debtor as a result of a payment defaults.  On August 25, 2016 Bridge froze the account and thereafter funds were swept from the Debtor's bank account at Bridge, reducing the principal amount of the loan to approximately $983,000.  On August 29, 2016, Bridge delivered a second Notice of Default to the Debtor as a result of various covenant defaults.  Finally, on August 31, 2016, Bridge delivered a third Notice of Default to the Debtor as a result of various payment and covenant defaults.  Immediately prior to the Petition Date, the loan was purchased from Bridge and is now held by Crius Solar Fulfillment.

      **(ii)**     **<u>The Spruce Loans</u>**

     14.     CPF Asset Management, LLC, now known as Spruce Finance ("**Spruce**") loaned $8,500,000 to Verengo via the: (i) *CPF Loan Addendum to Standard Master Installer Contract* dated May 9, 2014; (ii) *Restated and Amended CPF Loan Addendum to Standard Master Installer Contract* dated June 27, 2014; (iii) *Second Restated and Amended CPF Loan Addendum to Standard Master Installer Contract* dated September 12, 2014; (iv) *First Amendment to Second Restated and Amended CPF Loan Addendum to Standard Master Installer Contract* dated January 6, 2015; (v) *Third Restated and Amended CPF Loan Addendum to Standard Master Installer Contract* dated September 23, 2015; and (vi) *First Amendment to Third Restated and Amended CPF Loan Addendum to Standard Master Installer Contract* dated December 2, 2015 (collectively, the "**Spruce Loans**"). Spruce is an independent company that facilitates Verengo's business by purchasing the installation projects from Verengo and acting as a finance company for Verengo's customers. Interest is accruing on the Spruce Loans but no

principal payments have been made.  The Company believes the Spruce Loans to be junior to the Bridge Bank Loan and secured by the consigned goods reflected on Spruce's financing statements.  Immediately prior to the Petition Date, the Spruce Loans were also acquired by Crius Solar Fulfillment.

**(iii)**     **Related Party Debt**

15.     Additional secured notes (the "**Investor Notes**"), believed to be junior to both the Bridge Bank Loan and the Spruce Loan, are as follows:

| | | |
|---|---|---:|
| Angeleno | $ | 11,089,848 |
| ClearSky | | 11,089,848 |
| Arnold Fishman | | 422,191 |
| BainBridge Partners | | 133,460 |
| Org Bowen Campbell & Lauren Bishop | | 10,639 |
| Bishop Living Trust | | 218,695 |
| Total | $ | 22,964,682 |

No principal or interest payments are currently being made on the Investor Notes.  The Investor Notes were secured by liens on substantially all of the Debtor's assets.  A Subordination Agreement existed between Bridge Bank, Angeleno Group, and ClearSky Power & Technology Fund, dated December 2, 2015.

**D.**     **Events Leading to the Chapter 11 Filing**

16.     In 2013, the Company began to experience quality problems with its installations in the eastern part of the US.  Eventually, Verengo was suspended by the New York State Energy Research and Development Authority (NYSERDA), which prevented the Company from activating many of their installed systems until they were reinstalled.  This resulted in additional costs to Verengo and reduced cash flow.  In January 2015, all northeast operations were sold to NRG Energy, Inc.; contemporaneously, Northern and Central California operations were shut down.  In

addition, between 2012 and 2016 sales and marketing expenses for the origination part of the business were excessive and weighed on the Company's cash flow.

17.     In 2016, the Debtor continued to experience reduced cash flow and strained liquidity as a result.  As such, the Debtor implemented a focused business-to-business strategy, eliminating the unprofitable origination business and becoming an engineering, procurement and construction company.  As a result of these initiatives, the Debtor reduced year-over-year operating expenditures by $26.0 million and indirect costs by $3.9 million.  The Debtor also believes that its 2016 EBITDA will be positive by December, with 2017's forecasted cost reductions driven by reduced supply chain costs and volume increase.  The Debtor projects $2.6MM of revenue from new accounts from August through December 2016.

18.     Given the Debtor's inability to independently survive as a going concern, the board of directors of the Debtor has authorized the filing of this Chapter 11 Case to pursue a sale of the Debtor's assets.  In order to fund the continued operations of the Debtor during the completion of the marketing process, the DIP Lender has agreed to provide the Debtor with the DIP Facility pursuant to the DIP Documents and the DIP Orders.

19.     Additionally, the Debtor has entered into a stalking horse purchase agreement with Crius Solar Fulfillment.  The members of Crius Solar Fulfillment are Crius Energy, LLC, Angeleno Investors III—Verengo Solar, L.P. ("**Angeleno**"), ClearSky Funding I LLC ("**ClearSky**"), and Spruce.  Crius Solar Fulfillment was formed on or about September 22, 2016 to pursue the acquisition of the Bridge Loan and the provision of the DIP Credit Facility, as well as to serve as the stalking horse purchaser of

the Debtor's assets.   In connection with the formation of Crius Solar Fulfillment, Angeleno, ClearSky and Spruce contributed their holdings of the Spruce Notes and the Investor Notes held by them to Crius Solar Fulfillment.

20.    Crius Solar Fulfillment intends to credit bid $11.7 million comprised of (x) the amount outstanding under the DIP Credit Agreement at the time of closing, plus (y) the amount of the Secured Loan (as defined in the Stalking Horse Agreement) totaling $2,272,000, plus (z) such amount of Senior Notes (as defined in the Stalking Horse Agreement) necessary to total, when combined with the credit bid amounts from clauses (x) and (y), $11.7 million, for the purchase of all or substantially all of Verengo's assets. The Debtor intends to seek approval of certain bid protections and bidding procedures to complete the marketing process and ensure that the Debtor realizes the highest and best value for its assets.

21.    The Debtor will be able to draw up to $1.5 million of this facility immediately upon issuance of an interim order approving the DIP Credit Agreement. The DIP Credit Agreement also includes a release and waiver of certain rights in favor of the Syndicate as DIP Lender and as stalking horse purchaser. I believe the Debtor would be forced to immediately cease operations and liquidate its assets without access to the anticipated availability under the DIP Credit Agreement.

22.    This Chapter 11 Case will allow the Debtor to maintain operations and save jobs while providing the necessary time to complete the current sales process for the benefit of stakeholders. Absent the protections of the Bankruptcy Code, the Debtor will run out of cash, shut down operations, lay off employees and liquidate, all to the detriment of the Debtor's employees, customers, suppliers, and creditors.

*__Prepetition Marketing__*

23.     In complement to the Debtor's internal restructuring referenced above, the Debtor engaged Roth Capital Partners, LLC ("**Roth**") as an M&A Advisor in April 2016. Specifically, Roth was engaged to analyze the Debtor with respect to a valuation of the company, identify potential third party acquirers, and assist in structuring any transaction. Based on its knowledge of the solar industry, Roth executed a targeted outreach effort to groups it felt were well qualified as potential acquirers. This resulted in Roth contacting seventeen (17) strategic investors, holding in-depth discussions with seven (7), and securing four (4) groups under non-disclosure agreements. Despite these efforts, none of these discussions resulted in a transaction.

24.     In September 2016, the Debtor terminated Roth and retained SSG Advisors, LLC ("**SSG**") as investment banker to, *inter alia*, (i) prepare an information memorandum describing Verengo, its historical performance including existing operations, facilities, contracts, customers, management and projected financial results and operations; (ii) assist the Debtor in compiling a data room of any necessary and appropriate documents related to the Sale; (iii) assist the Debtor in developing a list of suitable potential buyers who will be contacted on a discreet and confidential basis after approval by the Debtor; (iv) coordinate the execution of confidentiality agreements for potential buyers wishing to review the information memorandum; (v) assist the Debtor in coordinating management calls and site visits for interested buyers and work with the management team to develop appropriate presentations for such presentations and visits; (vi) solicit competitive offers from potential buyers; (vii) advise and assist the Debtor in structuring the transaction and negotiating the transaction agreements; (viii) provide

testimony in support of the Sale; and (ix) otherwise assist the Debtor and its counsel as necessary through closing on a best efforts basis.  SSG intends to shop the Stalking Horse Purchaser's offer in an effort to achieve the highest bid for the Debtor's assets.

## II.
## FIRST DAY MOTIONS[2]

27. Concurrently with the filing of the voluntary petitions to commence this case, the Debtor will be filing a number of First Day Motions.  The Debtor anticipates that the Bankruptcy Court will conduct a hearing soon after the commencement of this case (the "**First Day Hearing**"), during which the Bankruptcy Court will entertain the arguments of counsel with respect to the relief sought in each of the First Day Motions.

26. Generally, the First Day Motions have been designed to meet the immediate goals of: (a) establishing procedures for the efficient administration of the Case; (b) continuing the Debtor's operations during this Case with as little disruption and loss of productivity as possible; and (c) maintaining the confidence and support of the Debtor's other key constituencies.  I have reviewed each of the First Day Motions, including the exhibits attached thereto, and believe that the relief sought in each of the First Day Motions is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve success in this case.

27. The First Day Motions are summarized below.

**A.     Motion of the Debtor for Interim and Final Orders Pursuant to Sections 105(a), 345(b), 363(c)(1), 503 and 507 of the Bankruptcy Code (I) Authorizing Continued Use of Existing Bank Accounts; (II) Authorizing Continued Use of Existing Checks and Business Forms; and (III) Waiving the Requirements of Section 345(b) of the Bankruptcy Code**

---

[2]     Capitalized terms used in Part II and not otherwise defined herein shall have the meanings ascribed to such terms in the respective First Day Motions.

28.     By this Motion, the Debtor requests entry of interim and final orders providing that until such time as the Debtor establishes its Debtor-in-Possession Account (the "**DIP Account**") but no later than forty-five (45) days from the Petition Date, the Debtor is (a) authorized for the continued use and maintenance of its Accounts and cash management system, (b) authorized for the continued use of the company credit cards; (c) authorized for the Debtor to pay the Bank Fees, without regard to when such fees arose; (d) authorized for the continued use of the existing Business Forms, and (e) not subject to the requirements of section 345(b) of the Bankruptcy Code, which are hereby waived on an interim basis.

29.     In order to minimize the disruption caused by these bankruptcy filings, and to maximize the value of the Debtor's estates, it is vital for the Debtor to maintain its current Accounts and cash management system.

30.     The Debtor also seeks a waiver of the U.S. Trustee's requirement that its existing Accounts be closed and that new postpetition bank accounts immediately be opened.  If enforced in this case, such requirements would cause significant disruption in the Debtor's business and would impair the Debtor's chapter 11 efforts.  In any event, the Debtor will promptly be opening the appropriate DIP Accounts at a bank that has executed a Uniform Depository Agreement with the Office of the United States Trustee for the District of Delaware.

31.     The Debtor also requests that it be authorized to continue to use all correspondence, business forms (including, but not limited to, letterhead, purchase orders, and invoices), and checks existing immediately before the Petition Date without reference to the Debtor's status as debtor-in-possession.  If the Debtor was required to

change its correspondence, business forms, and checks, it would be forced to choose standard forms rather than the current forms with which those that do business with the Debtor are familiar.  Such a change in operations would create a sense of disruption and potential confusion within the Debtor's organization, as well as with customers and suppliers.

32.     Each form of relief requested in the Cash Management Motion will help ensure the Debtor's smooth transition into chapter 11 and prevent the possible disruptions and distractions that could otherwise divert the Debtor's attention from more pressing matters during the initial days of this case.  For these reasons and as more thoroughly provided in the motion, I believe, and the Debtor submits, that the relief requested in the Cash Management Motion is in the best interest of the Debtor, its estate, and its creditors, and should therefore be approved.

**B.     Motion of the Debtor Pursuant to Sections 105, 363, 507, 1107 and 1108 of the Bankruptcy Code for Entry of an Order (I) Authorizing Debtor to Pay Prepetition Wages, Salaries and Benefits; (II) Authorizing Debtor to Continue Employee Benefit and Insurance Programs in the Ordinary Course of Business; and (III) Directing All Banks to Honor Prepetition Checks for <u>Payment of Prepetition Wage, Salary and Benefit Obligations</u>**

33.     In order to enable the Debtor to maintain morale during this critical time, retain its current Employees, and minimize the personal hardship such Employees may suffer if prepetition employee-related obligations are not paid when due or honored as expected, the Debtor, by this Motion (the "**Employee Wage Motion**"), seeks authority, in its discretion, to pay and honor, as the case may be, (a) all prepetition claims of Employees, including, but not limited to, claims for Wages and Salaries, PTO Days, and certain costs and disbursements related to the foregoing, up to the statutory cap of $12,850 per Employee, (b) any claims or payments pursuant to the Employee Benefit

Plans, and (c) all prepetition federal and state Withholding Obligations (collectively, the "**Employee Obligations**").  The Debtor further requests that the Court enter an order directing all banks to honor the Debtor's prepetition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

34.     The Debtor has costs and obligations with respect to its Employees relating to the period prior to the Petition Date.  By the Employee Wage Motion, the Debtor requests authority to pay wages and salaries accrued, but unpaid prepetition, on a postpetition basis, in an amount not to exceed $326,000.  The Debtor also seeks authority to pay all prepetition amounts owing for the services of its Independent Consultants and to continue to pay such amounts in the ordinary course of business.  Finally, the Debtor seeks authority to continue its Employee Benefit Plans, including reimbursement of certain expenses incurred by Employees, and generally make payments related thereto, in the ordinary course of business.

35.     The Debtor is required by law to withhold certain amounts from its Employees' wages and to remit the same to the appropriate taxing or other garnishment authorities.  These withholding amounts relate to Employee federal, state, and local payroll taxes, and Medicare taxes.  The Debtor may also be required to withhold amounts for other garnishments, as well as other witholdings such as contributions to savings, retirement or pension plans, and insurance contributions.  I believe that the current practice of directing such funds to the appropriate parties is in the ordinary course of business and appropriate on a postpetition basis.

36.     The Debtor also seeks an order directing all banks and payroll services to receive, process, honor and pay any and all checks drawn on the Debtor's bank account related to Employee Obligations, whether presented before or after the Petition Date, provided that sufficient funds are on deposit in the applicable account to cover such payments.

37.     The Debtor's business operations are heavily dependent upon their Employees.  If the Debtor is unable to immediately pay the prepetition Employee obligations and provide benefits to their Employees, the Debtor's ability to run its businesses will be placed in jeopardy.  Accordingly, the Debtor submits that the relief requested in the Employee Wage Motion is necessary to avoid immediate and irreparable harm.

**C.     Motion of the Debtor for Entry of an Order Authorizing The Debtor to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Certain Customer Practices and Programs in the Ordinary Course of Business**

38.     By this Motion, the Debtor seeks entry of an order, pursuant to sections 363, 507,  1107(a) and 1108 of the Bankruptcy Code, authorizing, but not directing, the Debtor, in its sole discretion, to honor outstanding obligations earned by and owing to its customers under the Debtor's customer-related programs, including without limitation, certain warranty programs (the "**Warranty Programs**")  and customer rebate programs (the "**Rebate Programs**") the Debtor offers in connection with its business (collectively, the "**Customer Programs**").  These Customer Programs will help to maintain customer satisfaction and loyalty with existing customers, as well as to promote revenue generated by new customers, without interruption throughout the duration of this case.

39.     The Debtor wishes to continue the Customer Programs, which are standard in the Debtor's industry, because they have been successful in the past and are directly responsible for generating valuable goodwill and increased revenue for the Debtor.  I believe that maintaining these benefits throughout this Chapter 11 Case is essential to the continued viability of the Debtor's business and, ultimately, to the prospects for a successful reorganization and/or a sale of substantially all of the Debtor's assets as a going concern.  Absent the relief requested, the pall cast by this Chapter 11 Case could negatively influence customers' attitudes and behavior towards the Debtor. In particular, the Debtor's goodwill and ongoing business relationships may suffer if its customers perceive that the Debtor are unable or unwilling to fulfill the prepetition promises that it has made through the Customer Programs.

40.     The cost to the Debtor associated with continuing the Customer Programs throughout this Chapter 11 Case will be nominal.  The continuation of the Customer Programs in the ordinary course is in the best interests of the Debtor and its creditors, as I believe it will help maintain the status quo between the Debtor and its customers, thereby preserving value.  For these reasons and as more thoroughly provided in the motion, I believe, the relief sought by this motion is appropriate and should therefore be approved.

**D.      Motion of the Debtor Pursuant to Sections 105 and 366 of the Bankruptcy Code for Entry of Interim and Final Orders (I) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services to, or Discriminating Against, the Debtor, (II) Determining that the Utility Companies are Adequately Assured of Postpetition Payment and (III) Establishing Procedures  for Resolving Requests for Additional Adequate <u>Assurance</u>**

41.     By this Motion (the "**Utilities Motion**"), the Debtor seeks entry of interim and final orders, the proposed forms of which are attached hereto: (i) prohibiting the Utility Companies (as defined below) from altering, refusing or discontinuing services to,

or discriminating against, the Debtor as a result of the commencement of this case or on account of prepetition invoices; (ii) approving the Debtor's proposed form of adequate assurance; (iii) establishing procedures for resolving adequate assurance objections by the Utility Companies; and (iv) scheduling the Final Hearing.

42.      During the course of this chapter 11 case, the Debtor intends to pay all postpetition obligations owed to the Utility Companies in a timely manner.  The Debtor has budgeted availability that is more than sufficient to pay all postpetition obligations for Utility Services.  With respect to adequate assurance of payment for postpetition services, the Debtor proposes to reserve an amount equal to two (2) weeks of expected Utility Service usage (calculated as the average weekly usage in the 12 months prior to the Petition Date) for each Utility Company.

43.      Uninterrupted Utility Services are essential to the preservation of the Debtor's estate and its assets, and therefore, to the success of this chapter 11 case.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtor's ability to preserve and maximize the value of its estate could be severely and irreparably harmed.  It is therefore critical that Utility Services continue on an uninterrupted basis.  For these reasons and as more thoroughly provided in the Utilities Motion, I believe, and the Debtor submits, that the relief requested in the Utilities Motion is in the best interest of the Debtor, its estate and creditors, and should therefore be approved.

E.     **Motion of the Debtor for Entry of an Order (A) Authorizing the Debtor to Pay Prepetition Sales Taxes and Regulatory Fees in the Ordinary Course of Business, and (B) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

44.     In connection with the normal operation of its business, the Debtor pay an assortment of sales taxes and similar taxes and fees (collectively, the "**Taxes and Fees**") to various federal, state, and local taxing authorities (collectively, the "**Taxing Authorities**").

45.     By this Motion (the "**Taxes and Fees Motion**"), the Debtor requests authority to pay, in the Debtor's sole discretion, prepetition Taxes and Fees owed to the Taxing Authorities, including, without limitation, Taxes and Fees subsequently determined to be owed for periods prior to the Petition Date, in an approximate aggregate amount of $122,911.93 (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date), which is the aggregate maximum sum that the Debtor currently believes will be due on account of prepetition Taxes and Fees.

46.     In certain circumstances, the Debtor collects sales taxes (the "**Sales Taxes**") upon the sale of its products.  The Debtor collects and remits or otherwise pays Sales Taxes as needed to the applicable Taxing Authorities in the United States.  In addition to the Sales Taxes owed but not yet paid as of the Petition Date, the Sales Taxes may also include amounts paid by checks sent prior to the Petition Date that have not cleared the Debtor's bank accounts on the Petition Date, though the Debtor is not aware of any such checks.

47.     The Debtor estimates that approximately $122,911.93 in Sales Taxes relating to the prepetition period will become due and owing in the ordinary course of business after the Petition Date.

48.     Accordingly, I submit that the relief requested in the Taxes and Fees Motion is necessary and appropriate, is in the best interests of its estate and creditors, and should be granted in all respects.

**F.      Motion of the Debtor for Entry of Interim and Final Orders Authorizing, but not Directing, Payment of Prepetition Claims of Critical Vendors Pursuant to 11 U.S.C. §§ 363(b), 1107 and 1108, Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 9013-1(m)**

49.     By this Motion (the "**Critical Vendor Motion**"), the Debtor requests, among other things, authority to pay, in the reasonable exercise of its business judgment and in its sole discretion, the Critical Vendor Claims, or a portion thereof, described in the Critical Vendor Motion that are essential to the uninterrupted functioning of the Debtor's business operations and who are not bound by contractual supply agreements with the Debtor.

50.     The Debtor also requests that the Court: (i) schedule a Final Hearing as soon as practicable after the 21st day following the Petition Date to consider approval of the Critical Vendor Motion on a final basis; (ii) after the Final Hearing, permit the Debtor to pay Critical Vendors up to $200,000; and (iii) authorize all applicable banks and financial institutions to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtor related to the Critical Vendor payments, whether such payments were presented or electronic requests were submitted before or after the date hereof.

51.     The Critical Vendors include: (i) certain suppliers that are the sole source from which the Debtor can procure certain goods and services due to the uniqueness of the services and goods being provided and cannot be replaced in a commercially reasonable manner, (ii) providers of connectivity and entire server system which operates

all of the Debtor's systems necessary for day to day operations; and (iii) lessor of vehicles necessary for site assessments and installations.

52.     For these reasons and as more fully set forth in the Critical Vendor Motion, I believe, and the Debtor submits that the failure to pay the prepetition claims of Critical Vendors will likely disrupt customer relationships, impair the Debtor's operations, and jeopardize the Debtor's ability to successfully consummate a sale as a going concern.

53.     Accordingly, the Debtor submits that the relief requested in the Critical Vendors Motion is necessary and appropriate, is in the best interests of its estate and creditors, and should therefore be approved.

**G.     Motion of the Debtor for Interim and Final Orders (I) Authorizing Post-Petition Secured Financing; (II) Authorizing the Debtor to Use Cash Collateral; (III) Providing Adequate Protection to the Prepetition Secured Parties; (IV) Modifying the Automatic Stay; (V) Providing Related Relief; <u>and (VI) Scheduling a Final Hearing</u>**

54.     By this motion (the "**DIP Motion**"), the Debtor requests entry of the Interim Order and a final order (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**"), authorizing the Debtor to enter into the $2.0 million DIP Credit Agreement (substantially in the form annexed as Exhibit B to the DIP Motion and incorporated herein by reference).

55.     I believe that the DIP Credit Agreement represents the best terms currently available to the Debtor and that the financing being provided (including the use of cash collateral) is necessary to continue operations postpetition and consummate a going concern sale of the Debtor's assets.

56.     The DIP Credit Agreement is critical to the success of this case. The Debtor is experiencing a significant liquidity shortfall. It is therefore necessary for the

Debtor to obtain new liquidity, substantially on the terms provided in the DIP Credit Agreement, and be permitted to use existing cash collateral, to maintain its business operations, and in turn, the going concern value of this estate pending consummation of the Sale. Absent the financing provided for in the DIP Credit Agreement, I believe that the Debtor will soon not be able to meet its direct operating expenses and would face the prospect of a complete cessation of operations. Such a result would undoubtedly cause immediate and irreparable harm to this estate by eliminating going concern value and any possibility of completing the Sale, all to the detriment of the Debtor's creditors and stakeholders.

57.     The Debtor is unable to procure financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code, without the grant of liens on assets. The Debtor has been unable to procure the necessary financing on terms more favorable than the financing offered by Lender pursuant to the DIP Credit Agreement.

58.     Accordingly, I submit that the Debtor's entry into the DIP Facility and securing the financing available thereunder is absolutely necessary to the preservation of estate assets and is in the best interest of the Debtor's creditors and all parties in interest.

**H.      Application for an Order Appointing UpShot Services LLC as Claims and Noticing Agent for the Debtor *Nunc Pro Tunc* to the Petition Date Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. 105(a) and Local Rule 2002-1(f)**

59.     This application (the "**UpShot Retention Application**") seeks an order appointing UpShot Services LLC ("**UpShot**") as the claims and noticing agent to assume

full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtor's chapter 11 case.

60.     The Debtor's selection of UpShot satisfies the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtor has obtained and reviewed engagement proposals from at least three (3) court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I believe based on all engagement proposals obtained and reviewed, that UpShot's rates are competitive and reasonable, given the quality of services and expertise.

61.     The Debtor seeks retention of UpShot solely in accordance with the terms set forth in the Services Agreement and the proposed order attached to the UpShot Retention Application.  Although the Debtor has not yet filed its schedules of assets and liabilities, I anticipate that there will be more than 200 creditors to notice in this chapter 11 case.  In view of the number of anticipated claimants, I believe that the appointment of UpShot as claims and noticing agent is in the best interest of the Debtor's estate and its creditors.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge and belief.

Dated: September 23, 2016                       By: */s/ Dan Squiller*
                                                     Dan Squiller