# **Exhibit B**

EXECUTION VERSION

# CREDIT AGREEMENT

THIS CREDIT AGREEMENT (this "*Agreement*") is made effective as of the 23rd day of September, 2016, by and between CRIUS SOLAR FULFILLMENT, LLC, a Delaware limited liability company (the "*DIP Lender*"), and VERENGO, INC., a Delaware corporation (the "*DIP Borrower*").

## INTRODUCTORY STATEMENTS

WHEREAS, the DIP Lender has agreed to extend to the DIP Borrower a secured revolving credit facility in an aggregate principal amount not to exceed Two Million Dollars ($2,000,000); and

WHEREAS, on September 23, 2016 (the "*Petition Date*"), the DIP Borrower filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*").

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and intending to be legally bound, each of the parties hereto agree as follows:

## ARTICLE 1.
## DEFINITIONS

SECTION 1.1    Defined Terms.  As used in this Agreement, the following terms have the following meanings:

"*Affiliate*" of any Person means (a) any Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, or (b) any Person who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person or (iii) of any Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the power, direct or indirect, (x) to vote more than 50% of the securities having ordinary voting power for the election of directors (or equivalent governing body) of such Person, whether by ownership of securities, contract, proxy or otherwise, or (y) to direct or cause the direction of the management and policies of such Person, whether by ownership of securities, contract, proxy or otherwise.

"*Bankruptcy Code*" has the meaning specified in the Introductory Statements hereto.

"*Bankruptcy Court*" has the meaning specified in the Introductory Statements hereto.

"*Budget*" means the budget for the 15-week period commencing on the Petition Date, substantially in the form of Schedule 1 to the DIP Order, as the same may be further amended, supplemented, restated or otherwise modified from time to time, including any such amendment, supplement, restatement or other modification in accordance with the terms of this Agreement that extends the Budget to cover additional time periods beyond the initial 15-week period covered by the Budget.

"***Business Day***" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"***Chapter 11 Case***" has the meaning specified in <u>Section 2.5(b)</u>.

"***Closing Fee***" has the meaning specified in <u>Section 3.1</u>.

"***Default***" means any event or condition that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"***DIP Borrower***" has the meaning specified in the Introductory Statements hereto.

"***DIP Collateral***" has the meaning specified in the DIP Order.

"***DIP Commitment***" means, as to the DIP Lender, its obligation to make Loans pursuant to <u>Section 2.1</u> in an aggregate principal amount not to exceed Two Million Dollars ($2,000,000).

"***DIP Lender***" has the meaning specified in the Introductory Statements hereto.

"***DIP Order***" has the meaning specified in <u>Section 4.1(b)</u>.

"***Effective Date***" means the date on which the conditions specified in <u>Section 4.1</u> are satisfied (or waived).

"***Indebtedness***" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business and any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all guarantees by such Person of Indebtedness of others, (g) all obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  The amount of Indebtedness of any Person for purposes of

clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"*GAAP*" means generally accepted accounting principles in the United States of America, as in effect from time to time.

"*Governmental Authority*" means the government of the United States of America, any other nation or any political subdivision thereof, whether federal, state, provincial, territorial, local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra national bodies such as the European Union or the European Central Bank).

"*Lien*" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"*Loan*" has the meaning set forth in <u>Section 2.1(a)</u>.

"*Loan Document*" means this Agreement and each other agreement, document, instrument or supplement executed and delivered to the DIP Lender pursuant to this Agreement, and any amendment, waiver, supplement or other modification to any of the foregoing.

"*Material Adverse Effect*" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities or condition (financial or otherwise) of the DIP Borrower; (b) a material impairment of the ability of the DIP Borrower to perform its obligations under this Agreement; or (c) a material impairment of the rights and remedies of the DIP Lender or a material adverse effect upon the legality, validity, binding effect or enforceability against the DIP Borrower of this Agreement.    In determining whether any individual event would result in a Material Adverse Effect, notwithstanding that such event in and of itself does not have such effect, a Material Adverse Effect shall be deemed to have occurred if the cumulative effect of such event and all other than existing events would result in a Material Adverse Effect.  Notwithstanding the foregoing, the filing of the Chapter 11 Case (and events that customarily occur leading up to the commencement and pendency of a proceeding under chapter 11 of the Bankruptcy Code) will not be deemed to have had a Material Adverse Effect.

"*Maturity Date*" has the meaning set forth in <u>Section 2.5(b)</u>.

"*Obligations*" means all amounts, now or hereafter, owing by the DIP Borrower to the DIP Lender pursuant to this Agreement or any other Loan Document (including all principal, interest, fees, indemnities and other amounts).

"*Organizational Documents*" means, with respect to any Person, the charter, articles or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"*Personnel Trigger Event*" means more than four (4) of the persons set forth on Schedule 1 attached hereto are no longer employed by the DIP Borrower in the capacities set forth beside their respective names on such Schedule 1.

"*Petition Date*" has the meaning specified in the Introductory Statements hereto.

"*Purchase Agreement*" means that certain Asset Purchase Agreement, dated as of September 23, 2016, by and between the DIP Borrower and the DIP Lender, as the same may be amended, restated, supplemented or otherwise modified in accordance with the terms thereof.

"*Requirements of Law*" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Responsible Officer*" means, with respect to any Person, the president, treasurer, chief executive officer, the chief operating officer, the chief financial officer, assistant treasurer, corporate controller or any vice president of such Person.

"*Subsidiary*" as to any Person, means a corporation, partnership, limited liability company or other entity of which shares of stock of each class or other interests having ordinary voting power (other than stock or other interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, by such Person or by one or more Subsidiaries of such Person or by such Person and one or more Subsidiaries of such Person. A Subsidiary shall be deemed wholly-owned by a Person who owns directly or indirectly all of the voting shares of stock or other interests of such Subsidiary having voting power under ordinary circumstances to vote for directors or other managers of such corporation, partnership or other entity, except for (a) directors' qualifying shares, (b) shares owned by multiple shareholders to comply with local laws and (c) shares owned by employees.

SECTION 1.2    Terms Generally.  As used herein or in any other Loan Document, accounting terms relating to the DIP Borrower not defined in Section 1.1, and accounting terms partly defined in Section 1.1 to the extent not defined, shall have the respective meanings given to them under GAAP. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, schedule and exhibit references are to this Agreement unless otherwise specified.  Unless otherwise expressly provided herein, references to agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other

modifications thereto, but only to the extent such amendments, restatements, extensions, supplements and other modifications are permitted by the DIP Order, this Agreement and the other Loan Documents.  The meanings given to terms defined herein shall be equally applicable to the singular and plural forms of such terms.

## ARTICLE 2.
## THE COMMITMENT AND LOANS

SECTION 2.1      The Credit Facility.

(a)      Subject to the terms and conditions set forth herein, the DIP Lender agrees to make one or more secured loans (each individually, a "*Loan*" and, collectively, the "*Loans*") to the DIP Borrower in a maximum aggregate principal amount at any time outstanding not to exceed the DIP Commitment.  Amounts repaid in respect of the Loans may be reborrowed subject to Section 2.1(b) and Section 4.2.

(b)      The DIP Borrower shall borrow Loans in amounts not exceeding the amount set forth in the Budget, subject to the permitted variances as set forth in the DIP Order.

SECTION 2.2      Requests for Borrowings.  To request a borrowing, the DIP Borrower shall notify the DIP Lender of such request by telephone not later than 12:00 p.m., New York City time, three (3) Business Days before the date of the proposed borrowing.  Each such telephonic request shall be irrevocable and shall be confirmed promptly by hand delivery or facsimile to the DIP Lender of a written request signed by the DIP Borrower.  Each such telephonic and written request shall specify the following information:

(a)      the aggregate amount of such borrowing;

(b)      the funding date of such borrowing, which shall be a Business Day;

(c)      the location and number of the DIP Borrower's account to which funds are to be disbursed; and

(d)      that, as of the date of such borrowing, the conditions set forth in Section 4.2 are satisfied.

SECTION 2.3      Interest.  Each Loan shall bear interest on the unpaid principal amount thereof from the date made at a rate per annum equal to twelve percent (12%). The DIP Borrower shall pay any such accrued interest on the Maturity Date in accordance with Section 2.5(b).  Interest hereunder shall be determined on the basis of a 365 (or 366 as the case may be) day year for the actual days elapsed.

SECTION 2.4      Default Interest.  If any Event of Default shall have occurred and be continuing, the Loans and other Obligations shall bear interest (which shall be payable on demand by the DIP Lender in writing) at a rate per annum which is two percent (2%) in excess of the applicable interest rate set forth in Section 2.3 above, compounding quarterly from the date of the occurrence of such Event of Default until such Event of Default is cured (if such cure is permitted by the provisions hereof) as well after as before judgment.

SECTION 2.5    Repayment of the Loans.

(a)    The DIP Borrower may prepay (subject to being reborrowed as may be permitted by Section 2.1 above) all or any portion of the outstanding principal amount of Loans or accrued interest at any time and from time to time, without premium or penalty, with prior written notice delivered no later than 12:00 p.m. New York City time three (3) Business Days prior to the date of such prepayment. All partial prepayments shall be applied first to accrued and unpaid interest, and second to the unpaid principal amount of the Loans.

(b)    Notwithstanding the foregoing, the DIP Borrower shall pay the DIP Lender the entire outstanding amount of the Loans in full in cash, together with any accrued and unpaid interest incurred in accordance with this Agreement, on the date that is the earliest of (a) the date a plan is consummated in the chapter 11 case of the DIP Borrower (the "***Chapter 11 Case***"), (b) the date of consummation of a sale of all or substantially all of the assets of the DIP Borrower, or (c) December 31, 2016 (the "***Maturity Date***").

## ARTICLE 3.
## FEES

SECTION 3.1    Commitment Fee.  The DIP Borrower shall pay (or cause to be paid) to the DIP Lender a fee (the "***Closing Fee***") equal to 2.00% of the aggregate amount of the DIP Commitments as of the Effective Date.  The Closing Fee shall be fully vested and earned upon entry of the DIP Order, and shall be payable in full on the Maturity Date.  Once paid, the Closing Fee payable under this Section 3.1 shall not be refundable under any circumstances and shall be paid free of any setoff.

## ARTICLE 4.
## CONDITIONS TO CREDIT EXTENSIONS

SECTION 4.1    Conditions to Initial Loans.  The obligation of the DIP Lender to make the initial Loans hereunder is subject to satisfaction of the following conditions precedent:

(a)    DIP Agreement.  The DIP Lender shall have received an executed counterpart of this Agreement from the DIP Borrower.

(b)    DIP Order.  The DIP Lender shall have received a copy of the Bankruptcy Court interim order approving this Agreement (such order, including once approved by the Bankruptcy Court on a final basis, the "***DIP Order***"), which order (i) shall be in form and substance satisfactory to the DIP Lender, (ii) shall not have been stayed, vacated or revered (in whole or in part) and (iii) shall not have been amended or modified other than with the consent of the DIP Lender.

(c)    Secretary Certificate.  The DIP Lender shall have received a copy of (i) each Organizational Document of the DIP Borrower certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) signature and incumbency certificates of the officers of the DIP Borrower executing the Loan Documents, (iii) resolutions of the board of directors and/or similar governing body of the DIP Borrower approving and authorizing the execution, delivery and performance of Loan Documents, certified as of the Effective Date by its

secretary or an assistant secretary as being in full force and effect without modification or amendment, and (iv) a good standing certificate from the State of Delaware with respect to the DIP Borrower.

(d)    <u>Closing Certificate</u>.  The DIP Lender shall have received a certificate executed by a Responsible Officer of the DIP Borrower certifying that (i) except with respect to the filing of the Chapter 11 Case, there has been no event or circumstance since the Petition Date that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (b) either (i) no consents, licenses or approvals are required in connection with the execution, delivery and performance by the DIP Borrower and the validity against the DIP Borrower of this Agreement, or (ii) subject to the entry by the Bankruptcy Court of the DIP Order, all such consents, licenses and approvals have been obtained and are in full force and effect.

(e)    <u>Insurance</u>.  The DIP Lender shall have received certificates of insurance and endorsements evidencing the existence of insurance required to be maintained by the DIP Borrower pursuant to this Agreement, and, if applicable, the DIP Lender shall be named as an additional insured or loss payee, as the case may be, under insurance policies maintained with respect to the assets and properties of the DIP Borrower.

(f)    <u>Budget</u>. The DIP Lender shall have received the Budget and such other financial statements or information as the DIP Lenders shall have reasonably requested prior to the Effective Date.

SECTION 4.2    <u>Conditions to All Credit Extensions Loans</u>.  The obligation of the DIP Lender to make any Loan hereunder (including the initial Loans) is subject to satisfaction of the following conditions precedent:

(a)    <u>Notice of Borrowing</u>.  The DIP Lender shall have received a request for such Loan in accordance with <u>Section 2.2</u>.

(b)    <u>Representations and Warranties</u>.  The representations and warranties of the DIP Borrower contained in <u>Article 5,</u> or which are contained in any other Loan Document, shall be true and correct in all material respects on and as of the date of the making of any Loan, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, and (ii) in the case of any representation and warranty qualified by materiality, in which case they shall be true and correct in all respects.

(c)    <u>No Default</u>.  No Default or Event of Default shall exist, or would result from such proposed Loan or from the application of the proceeds thereof.

(d)    <u>DIP Order</u>.  The DIP Order shall not have been (i) stayed, vacated or reversed (in whole or in part), or (ii) amended or modified other than with the consent of the DIP Lender.

(e)    <u>Budget</u>. The purpose of each borrowing shall be consistent with the Budget in accordance with <u>Section 6.7</u>.

(f)    Fees.  The DIP Lender shall have received all fees, expenses and other consideration agreed to in writing by it or otherwise presented for payment and that are required to be paid or delivered on or before the date of such borrowing.

Each borrowing request submitted by the DIP Borrower shall be deemed to be a representation and warranty that the conditions specified in Section 5.2(b), (c), (d) and (e) have been satisfied on and as of the date of the applicable borrowing.

SECTION 4.3    Post-Closing Conditions.

(a)    Control Agreements.  Within thirty (30) days after the Petition Date, the DIP Borrower shall have entered into a deposit account control agreement, in form and substance reasonably satisfactory to the DIP Lender, with each financial institution at which the DIP Borrower maintains deposit accounts on or after the Petition Date, pursuant to which such financial institution shall confirm and acknowledge the DIP Lender's security interest in such deposit accounts and shall agree to comply with instructions originated by the DIP Lender as to disposition of funds in such deposit accounts without further consent by the DIP Borrower.

## ARTICLE 5.
## REPRESENTATIONS AND WARRANTIES

The DIP Borrower hereby represents and warrants to the DIP Lender that:

SECTION 5.1    Existence, Qualification and Power.  The DIP Borrower (a) is a corporation, duly incorporated, validly existing and in good standing under the laws of the State of Delaware, (b) subject to any entry of any required orders of the Bankruptcy Court including, without limitation, the entry of the DIP Order, has all requisite power and authority and all requisite governmental licenses, permits, authorizations, consents and approvals necessary to (i) own or lease its material assets and carry on its business in the ordinary course and (ii) execute, deliver and perform its obligations under this Agreement, and (c) is duly qualified and is licensed and, where applicable, in good standing under the laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.2    Authorization; No Contravention.  Subject to the entry of the DIP Order, the execution, delivery and performance by the DIP Borrower of this Agreement and each of the Loan Documents has been duly authorized by all necessary corporate or other organizational action, and does not and will not: (a) contravene the terms of any of the DIP Borrower's Organizational Documents; (b) conflict with or result in any breach, termination, or contravention of, or constitute a default under, or require any payment to be made under (ii) any contract or any indebtedness to which the DIP Borrower is a party or affecting DIP Borrower or its properties or (ii) any order, injunction, writ or decree of any governmental authority or any arbitral award to which such person or its property is subject, (c) result in or require the creation of any Lien upon any asset of the DIP Borrower (other than Liens under the DIP Order), or (d) violate any Requirement of Law applicable to or binding upon the DIP Borrower or any of its properties or assets.

SECTION 5.3    <u>Governmental Authorization; Other Consents</u>.  Subject to the entry of the DIP Order, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, the DIP Borrower of this Agreement or any other Loan Document, except for such as have been obtained or made and are in full force and effect.

SECTION 5.4    <u>Binding Effect</u>.    This Agreement has been duly executed and delivered by the DIP Borrower.  Subject to the entry of the DIP Order, this Agreement and each other Loan Document constitutes a legal, valid and binding obligation of the DIP Borrower, enforceable against the DIP Borrower in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 5.5    <u>Litigation</u>.  Except as specifically set forth on <u>Schedule 4.5</u> attached hereto, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the DIP Borrower, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against DIP Borrower that (a) purport to affect or pertain to this Agreement, the Loan Documents or any of the transactions contemplated thereby, or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to result in material liability to the DIP Borrower.

SECTION 5.6    <u>Insurance</u>.    The properties of the DIP Borrower is insured with financially sound and reputable insurance companies with such deductibles and covering such risks (including, without limitation, workmen's compensation, public liability, business interruption and property damage insurance) as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the DIP Borrower operates.

SECTION 5.7    <u>Compliance with Laws and Budget</u>.    Except to the extent non-performance thereof is permitted by the Bankruptcy Code, the DIP Borrower is in compliance with (a) the Requirements of Laws and (b) the Budget, subject to the permitted variances as set forth in the DIP Order

SECTION 5.8    <u>No Default</u>.    No Default or Event of Default has occurred and is continuing.

SECTION 5.9    <u>Financial Statements, Etc</u>. The DIP Borrower has furnished to the DIP Lender (a) the consolidated balance sheet and related statements of income, stockholders' equity and cash flows of the DIP Borrower and its consolidated Subsidiary as of and for the fiscal years ended December 31, 2012, December 31, 2013 and December 31, 2014, audited by and accompanied by the opinion of Squar, Milner, Peterson, Miranda & Williamson LLP and (b) the unaudited consolidated balance sheet and related statements of income, stockholders' equity and cash flows of the DIP Borrower as of and for the fiscal month ended May 31, 2015.  Such financial statements present fairly in all material respects the consolidated financial condition and results of operations of the DIP Borrower as at such dates and for such periods.  All such financial statements, including any related schedules and notes thereto have been prepared in

accordance with GAAP applied consistently throughout the periods involved subject, in the case of unaudited financial statements, to audit adjustments and the absence of footnotes

SECTION 5.10    Information Correct.    None of the reports, financial statements, certificates or other written information furnished by or on behalf of the DIP Borrower to the DIP Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished), when taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; provided that, with respect to projected financial information, including, without limitation, such projected information set forth in the Budget, the DIP Borrower represents only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date, it being understood that any such projected financial information may vary from actual results and such variations could be material.  The DIP Borrower has not failed to disclose to the DIP Lender any material assumptions made with respect to, or in connection with, the Budget and all reports or other information contained in the Budget are true, correct, complete and accurate in all material respects

SECTION 5.11    Federal Regulations; Investment Company Act.

(a)    No part of the proceeds of the Loan will be used for any purpose which violates the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System, together with any successor.  The DIP Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under said Regulation U.

(b)    The DIP Borrower is not required to register as an "investment company" (as defined or used in the Investment Company Act of 1940, as amended).

## ARTICLE 6.
## AFFIRMATIVE COVENANTS

SECTION 6.1    Financial Statements.    The DIP Borrower shall furnish to the DIP Lender:

(a)    on or before 5:00 p.m., New York City time, of Wednesday of each calendar week, commencing September 26, 2016, (i) a comparison of actual results for the weekly period ending the preceding Friday before such date of all items contained in the Budget to the amounts originally contained in the Budget, and (ii) a cumulative comparison of the actual results for the period from the Petition Date through the end of the week for the weekly period ending the preceding Friday before such date of results of all items contained in the Budget to the amounts originally contained in the Budget; and

(b)    as soon as available, but in any event not later than fifteen (15) days after the end of each calendar month to end after the Effective Date (commencing with the calendar

month ending September 30, 2016) (i) the unaudited consolidated balance sheet of the DIP Borrower as at the end of each such month, and (ii) the related unaudited consolidated statements of income and cash flows of the DIP Borrower for such month and the portion of the fiscal year of the DIP Borrower through such month-end date, accompanied by a certificate of a Responsible Officer, which certificate shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial condition and results of operations of the DIP Borrower.

SECTION 6.2    Notices and Other Information.

(a)    the DIP Borrower shall promptly deliver to the DIP Lender, no less than three (3) Business Days prior to the filing thereof, drafts of all pleadings, motions, applications, judicial information, financial information and any other documents to be filed by or on behalf of the DIP Borrower in the Chapter 11 Case;

(b)    the DIP Borrower shall promptly deliver to the DIP Lender and any parties required to receive notice in the DIP Order notice of (i) the occurrence of any Default or Event of Default, (ii) any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, (iii) any breach or non-performance of, or any default under, a material contract of the DIP Borrower other than breaches or defaults arising as a result of the filing of the Chapter 11 Case, the exercise of remedies as a result of which are stayed under the Bankruptcy Code, (iv) of any dispute, litigation, investigation, proceeding or suspension between the DIP Borrower and any Governmental Authority or the commencement of, or any material development in, any material litigation or proceeding affecting the DIP Borrower,  each of which is reasonably expected to result in a Material Adverse Effect, (v) the filing of any Lien for unpaid taxes against the DIP Borrower, or (vi)  any casualty or other insured damage to any material portion of the DIP Collateral or the commencement of any action or proceeding for the taking of any interest in a material portion of the DIP Collateral under power of eminent domain or by condemnation or similar proceeding or if any material portion of the DIP Collateral is damaged or destroyed; and

(c)    The DIP Borrower shall deliver to the DIP Lender and the parties required to receive notice in the DIP Order promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the DIP Borrower, or compliance with the terms of any Loan Document, as the DIP Lender may reasonably request.

SECTION 6.3    Payment of Obligations.  Subject to the provisions of the Bankruptcy Code and in accordance with the Budget, the DIP Borrower shall pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, (b) all lawful claims (including, without limitation, claims of landlords, warehousemen, customs brokers, freight forwarders, consolidators and carriers) which, if unpaid, would by law become a lien upon its property; and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such indebtedness, except, in each case, where (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) such DIP Borrower has set aside on its books adequate reserves with respect thereto, (iii) such contest effectively suspends collection of the

- 11 -

contested obligation and enforcement of any lien securing such obligation, (iv) no Lien has been filed with respect thereto and (v) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect. For the avoidance of doubt, nothing herein requires payment of any obligation subject to the automatic stay of the Bankruptcy Code.

SECTION 6.4     Preservation of Existence.    The DIP Borrower shall (a) preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization or formation, (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its intellectual property, except to the extent such intellectual property is no longer used or useful in the conduct of the business of the DIP Borrower.

SECTION 6.5     Maintenance of Properties; Maintenance of Insurance.    The DIP Borrower shall (a) maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; and (b) make all necessary repairs thereto and renewals and replacements thereof, except in all cases where the failure to do so could not reasonably be expected to have a Material Adverse Effect.  The DIP Borrower shall maintain with financially sound and reputable insurance companies insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by persons engaged in the same or similar business and operating in the same or similar locations or as is required by applicable law, of such types and in such amounts as are customarily carried under similar circumstances by such other persons.

SECTION 6.6     Compliance with Laws.    Except to the extent noncompliance is permitted under the Bankruptcy Code or could not reasonably be expected to have a Material Adverse Effect, the DIP Borrower shall comply with the Requirements of Law.

SECTION 6.7     Use of Proceeds.    The DIP Borrower shall use the proceeds of the Loans, to the extent permitted under applicable law, the Budget (subject to the permitted variances set forth in the DIP Order) and this Agreement, (a) to finance general working capital purposes of the DIP Borrower in the ordinary course of business or as otherwise approved by the DIP Lender, and (b) to pay fees, expenses, and costs incurred in connection with the Chapter 11 Case, as well as the payment of any adequate protection approved in the DIP Order.

SECTION 6.8     Information Regarding the DIP Collateral.    The DIP Borrower shall furnish to the DIP Lender and the parties required to receive notice in the DIP Order, at least fifteen (15) days prior written notice of any change in: (a) the DIP Borrower's name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties; (b) the location of the DIP Borrower's chief executive office, its principal place of business, any office in which it maintains books or records relating to the DIP Collateral owned by it, (c) the DIP Borrower's organizational structure or jurisdiction of incorporation or formation, or (d) the DIP Borrower's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization. The DIP Borrower agrees not to affect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform

Commercial Code or otherwise that are required in order for the DIP Lender to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the DIP Collateral.

SECTION 6.9    Inspection of Property; Books and Records; Discussions; Management Presentations. The DIP Borrower shall keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities which permit financial statements to be prepared in conformity with GAAP and all Requirements of Law; and permit representatives of the DIP Lender upon reasonable notice to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be requested, and to discuss the business, operations, assets and financial and other condition of the DIP Borrower with officers and employees thereof.  Upon request by the DIP Lender, and in no event less frequently than on a bi-weekly basis, the senior management of the DIP Borrower shall provide management presentations to the DIP Lender.

SECTION 6.10    Material Contracts.    Except to the extent nonperformance thereof is permitted by the Bankruptcy Code, and other than as a result of the filing of the Chapter 11 Case and the effect thereof, the DIP Borrower shall (a) maintain each material contract in full force and effect and (b) enforce each material contract in accordance with its terms.

SECTION 6.11    Performance Within Budget.    The DIP Borrower shall perform in accordance with the Budget, including having made all scheduled payments to DIP Lender, subject to the permitted variances set forth in the DIP Order, and timely provide notices to the parties required to receive notice in the DIP Order, as applicable, as and when required.

SECTION 6.12    DIP Order.    The DIP Borrower shall comply with the DIP Order, as then in effect, in all respects, and shall not seek any reversal, vacatur, stay, amendment or modification thereto without consent of the DIP Lender.

SECTION 6.13    Further Actions.    The DIP Borrower shall take such further actions and shall execute such further documents or instruments as may be reasonably necessary to fulfill or give force and effect to this Agreement, including without limitation that the DIP Borrower agrees to issue a promissory note to evidence the Loans upon request.

## ARTICLE 7.
## NEGATIVE COVENANTS

SECTION 7.1    Indebtedness.

(a)    The DIP Borrower shall not,  on or after the date hereof, (a) create, incur, assume, guarantee, suffer to exist or otherwise become or remain liable with respect to, any Indebtedness, except

(i)    Indebtedness incurred pursuant to the Loan Documents;

(ii)    Indebtedness outstanding on the Effective Date and listed on Schedule 6.1 attached hereto;

(iii)    Indebtedness incurred in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement type obligations regarding workers compensation claims in accordance with the Budget; and

(iv)    trade credit incurred in the ordinary course of business in accordance with the Budget.

(b)    The DIP Borrower shall not issue and sell any capital stock, without, in each case, the prior written consent of the DIP Lender.

SECTION 7.2    Liens. The DIP Borrower shall not create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired other than the following Liens (to the extent, with respect to the DIP Borrower or any of its assets or properties (x) if created, incurred or assumed by such Person on or after the Petition Date, such Liens have been approved and authorized by the Bankruptcy Court with the prior written consent of the DIP Lender and (y) if created, incurred or assumed by such Person before the Petition Date, such Liens have the priority set forth in the DIP Order):

(a)    Liens granted pursuant to the Loan Documents;

(b)    Liens outstanding on the Effective Date and listed on Schedule 6.2 attached hereto;

(c)    Liens arising after the Petition Date for taxes, assessments or other governmental charges not yet delinquent or which are being contested in good faith and by appropriate proceedings if adequate reserves with respect thereto are maintained on the books of the DIP Borrower in accordance with GAAP;

(d)    Liens which are statutory liens for amounts incurred before or after the Petition Date in connection with workmen's compensation obligations, unemployment insurance and other social security laws; and

(e)    carriers', warehousemen's, mechanics' repairmen's and other like Liens imposed by law, arising in the ordinary course of business.

SECTION 7.3    Investments. The DIP Borrower shall not make any loans, advances or other transfers of assets or investments to any Person without the consent of the DIP Lender.

SECTION 7.4    Fundamental Changes. The DIP Borrower shall not merge, dissolve, liquidate, consolidate with or into another person without the prior written consent of the DIP Lender

SECTION 7.5    Dispositions. The DIP Borrower shall not other than in the ordinary course of business, sell, assign, transfer, license, lease or otherwise dispose (whether in one transaction or in a series of transactions, and including any sale and leaseback transaction and

any sale, transfer, license or other disposition) of any property (including, without limitation, any capital stock) or grant any option or other right to do any of the foregoing without, in any such case, the prior written consent of the DIP Lender.

SECTION 7.6    <u>Dividends</u>.  The DIP Borrower shall not declare any dividends on any shares of any class of capital stock, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, retirement or other acquisition of any shares of any class of capital stock, or any warrants or options to purchase such capital stock, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the DIP Borrower.

## ARTICLE 8.
## EVENTS OF DEFAULT

SECTION 8.1    <u>Events of Default</u>.  The occurrence and continuance of any of the following events shall constitute an "***Event of Default***," unless waived in writing by the DIP Lender:

(a)    The DIP Borrower shall fail to pay any principal of any Loan when the same shall become due and payable by the terms of this Agreement; or

(b)    The DIP Borrower shall fail to pay any interest, fee or amount (other than principal) within two (2) Business Days after any such interest, fee or amount becomes due and payable; or

(c)    The DIP Borrower fails to perform or observe any term, covenant or agreement contained in <u>Section 6.1</u>, <u>Section 6.2(b)(i)</u> or <u>Article 7</u> of this Agreement; or

(d)    The DIP Borrower fails to perform or observe any other term, covenant or agreement contained in this Agreement and such default shall continue unremedied for a period of five (5) days; or

(e)    On a cumulative basis, commencing on the Petition Date, (i) cumulative Receipts are below the cumulative amount of Receipts identified in the Budget or (ii) cumulative Disbursements are above the cumulative amount of Disbursements identified in the Budget, in each case, subject to the permitted variances as set forth in the DIP Order; or

(f)    Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the DIP Borrower herein or in any document delivered in connection herewith shall be incorrect or misleading in any material respect when made or deemed made (or, with respect to any representation, warranty, certification, or statement of fact qualified by materiality, incorrect or misleading in any respect); or

(g)    Any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of the DIP Borrower; or

(h)     Except as otherwise expressly permitted hereunder, the DIP Borrower shall take any action to suspend the operation of its business in the ordinary course or liquidate all or a material portion of its assets; or

(i)     There occurs any uninsured loss to any material portion of the DIP Collateral; or

(j)     The occurrence of a Material Adverse Effect; or

(k)     The DIP Borrower files a motion with the Bankruptcy Court seeking the authority to liquidate all or substantially all of the DIP Borrower's assets or capital stock without the prior written consent of the DIP Lender; or

(l)     The entry of an order reversing, amending, supplementing, staying, vacating or otherwise modifying this Agreement or the DIP Order, without the written consent of the DIP Lender, or the filing by the DIP Borrower of a motion for reconsideration with respect to the DIP Order or the DIP Order is otherwise not in full force and effect, in each case, without the consent of the DIP Lender; or

(m)     The entry of an order dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; or

(n)     The entry of an order appointing a chapter 11 trustee or examiner with expanded powers in the Chapter 11 Case; or

(o)     The lapse, reduction or termination of the DIP Borrower's exclusivity period to file and solicit a plan of reorganization pursuant to section 1121 of the Bankruptcy Code or the conversion of the Case to a case under chapter 7 of the Bankruptcy Code; or

(p)     The DIP Borrower's breach any material provisions of the DIP Order; or

(q)     The entry of an order in the Chapter 11 Case charging any of the DIP Collateral (as defined in the DIP Order) under Section 506(c) of the Bankruptcy Code or otherwise; or

(r)     The entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow foreclosure (or granting of a deed in lieu of foreclosure) on any DIP Collateral; or

(s)     The Debtor seeks to commence an action against the DIP Lender, the First Lien Lender with respect to any of the Prepetition First Lien Obligations or First Lien Documents, or the Debtor otherwise fails to comply in any material respect with any of the material terms or conditions contained in this Agreement or the DIP Order; or

(t)     The payment of any prepetition claims (other than as permitted by the DIP Order or pursuant to an order entered in the Chapter 11 Case that is supported, or not objected to, by the DIP Lender); or

(u)　　Any party other than the DIP Lender or its designee is selected as the winning bidder for the Debtor's assets and the DIP Loan is not paid off in full in cash within five (5) Business Days of entry of an order in the Chapter 11 Case approving such party as the winning bidder; or

(v)　　The DIP Order has not been approved by the Bankruptcy Court on a final basis within thirty (30) days of the Petition Date; or

(w)　　The occurrence of a Personnel Trigger Event; or

(x)　　The DIP Borrower breaches any of its covenants, agreements, representations or warranties in the Purchase Agreement, and such breach is not waived or cured within the applicable cure period set forth in the Purchase Agreement.

If an Event of Default has occurred, and at any time thereafter during the continuance of such event, the DIP Lenders shall, by notice to the DIP Borrower, take either or both of the following actions, at the same or different times: (i) terminate the DIP Commitment, and thereupon the Commitment shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the DIP Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the DIP Borrower.

SECTION 8.2　　Remedies Cumulative; No Waiver.　Each and every right, power and remedy hereby specifically given to the DIP Lender shall be in addition to every other right, power and remedy specifically given under this Agreement, the Order or the other Loan Documents or now or hereafter existing at law or in equity, or by statute and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the DIP Lender.　All such rights, powers and remedies shall be cumulative and the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise of any other or others.　No delay or omission of the DIP Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Default or Event of Default or an acquiescence therein

SECTION 8.3　　Discontinuance of Proceedings.　In case the DIP Lender shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason, then and in every such case the DIP Borrower, the DIP Lender and each holder of any of the Obligations shall be restored to their former positions and rights hereunder with respect to the DIP Collateral subject to the Liens granted under this Agreement and the DIP Order, and all rights, remedies and powers of the DIP Lender shall continue as if no such proceeding had been instituted.

## ARTICLE 9.
## MISCELLANEOUS

SECTION 9.1    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the DIP Borrower, the DIP Lender and their respective successors and permitted assigns. Notwithstanding the foregoing, the DIP Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the DIP Lender, such consent not to be unreasonably withheld or delayed.  Except as provided below, the DIP Lender may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the DIP Borrower, such consent not to be unreasonably withheld or delayed.  Notwithstanding the foregoing, the DIP Lender may, without the consent of the DIP Borrower, assign or transfer to any other Person or Persons any or all of its rights or obligations under this Agreement.  The DIP Lender may without the consent of the DIP Borrower sell participations in its Loan and rights under this Agreement.

SECTION 9.2    Amendments and Waivers.  Except as otherwise expressly set forth in this Agreement, no Loan Document nor any terms thereof may be amended, supplemented, waived or modified except in accordance with the provisions of this Section 9.2.  The DIP Lender and the DIP Borrower may, from time to time, enter into written amendments, supplements or modifications hereto for the purpose of adding any provisions to any Loan Document or changing in any manner the rights of the DIP Lender or of the DIP Borrower thereunder or waiving, on such terms and conditions as the DIP Lender may specify in such instrument, any of the requirements of any such Loan Document or any Default or Event of Default and its consequences.  Any such waiver and any such amendment, supplement or modification described in this Section 9.2 shall be binding upon the DIP Borrower, the DIP Lender and all of their successors and assigns.  In the case of any waiver, the DIP Borrower and the DIP Lender shall be restored to their former position and rights hereunder, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

SECTION 9.3    Liens and Security.  The Liens and claim priorities of the DIP Borrower's obligations hereunder shall be those contained in the DIP Order.

SECTION 9.4    Payment of Expenses; Indemnification.  The DIP Borrower agrees (a) to pay or reimburse the DIP Lender for all its reasonable out-of-pocket costs and expenses incurred in connection with the development, negotiation, preparation and execution of the Loan Documents and any other documents prepared in connection herewith, and the consummation of the transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and disbursements of one lead counsel and one local counsel to the DIP Lender, (b) to pay or reimburse the DIP Lender for all its costs and expenses incurred in connection with, and to pay, indemnify, and hold the DIP Lender harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever arising out of or in connection with, the administration, enforcement or preservation of any rights under any Loan Document and any such other documents, including, without limitation, reasonable fees and disbursements of counsel to the DIP Lender incurred in connection with the foregoing and in connection with

- 18 -

advising the DIP Lender with respect to its rights and responsibilities under this Agreement and the documentation relating thereto, (c) to pay, indemnify, and to hold the DIP Lender harmless from any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other similar taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, any Loan Document and any such other documents, and (d) to pay, indemnify, and hold the DIP Lender and its respective Affiliates, officers, directors, trustees, agents, attorneys and advisors harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including, without limitation, reasonable fees and disbursements of counsel) which may be incurred by or asserted against the DIP Lender or such Affiliates, officers, directors, trustees, agents, attorneys or advisors arising out of or in connection with any investigation, litigation or proceeding related to this Agreement, the other Loan Documents, the proceeds of the Loan and the transactions contemplated by or in respect of such use of proceeds, or any of the other transactions contemplated hereby, whether or not any of the DIP Lender or such Affiliates, officers, directors or trustees is a party thereto (all the foregoing, collectively, the "*indemnified liabilities*"); provided that the DIP Borrower shall not have any obligation hereunder with respect to indemnified liabilities of the DIP Lender or any of its Affiliates, officers, directors, trustees, agents, attorneys or advisors to the extent such indemnified liabilities are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct by the person seeking indemnification.

SECTION 9.5    Right of Offset.  All payments under this Agreement may be made by offset, counterclaim or deduction of any kind, provided there is prior consent by the DIP Lender for such offset, counterclaim or deduction.

SECTION 9.6    Governing Law; Jurisdiction.

(a)    This Agreement shall be governed by and interpreted in accordance with the laws in force in the State of New York of the United States of America and the applicable provisions of the Bankruptcy Code.

(b)    Each party hereto hereby irrevocably and unconditionally submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents  to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, to the non-exclusive general jurisdiction of any State or Federal court of competent jurisdiction sitting in the State of Delaware, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the DIP Lender may otherwise have to bring any action or proceeding relating to this Agreement against the DIP Borrower or its properties in the courts of any jurisdiction.

(c)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section 9.6.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

SECTION 9.7    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.8    Notices.  Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, as follows:

The DIP Borrower:

Verengo, Inc.
20285 S. Western Avenue, Suite 200
Torrance, CA 90501
Attn: Dan Squiller

*With a copy to:*

Bayard, P.A.
222 Delaware Avenue
Wilmington, DE  19899
Attn:  Scott D. Cousins
        Evan T. Miller


The DIP Lender:

Crius Solar Fulfillment, LLC
Crius Solar Fulfillment, LLC
c/o Crius Energy, LLC
1055 Washington Blvd., Floor 7

Stamford, CT 06901
Attention: Chief Legal Officer
Email: bclay@criusenergy.com


*With a copy to:*

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attn:  Paul Shalhoub
    A. Mark Getachew
    Jeffrey M. Goldfarb

provided that any notice, request or demand to or upon the DIP Lender shall not be effective until received and; provided, further, that the failure to provide the copies of notices to the DIP Borrower provided for in this Section 9.8 shall not result in any liability to the DIP Lender.

SECTION 9.9    Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.10    Counterparts; Integration; Effectiveness.  This Agreement may be executed manually or by facsimile by the parties hereto, in any number of counterparts, each of which shall be considered one and the same agreement and shall become effective when a counterpart hereof shall have been signed by each of the parties and delivered to the other parties hereto.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.11    Headings.    Article and Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.


*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be effective as of the day and year first above written.

DIP LENDER:

**CRIUS SOLAR FULFILLMENT, LLC**

By: _____
Name:
Title:

DIP BORROWER:

**VERENGO, INC.**

By: _____
Name:
Title:

**Schedule 1**

| Name: | Job Title: |
| --- | --- |
| Matthew Lees | Director, IT & Facilities |
| Chinmay Abhyankar | Manager, Operational Excellence |
| Rhonda Gornitsky | SVP General Counsel |
| James White | Director, Operations |
| Alex Jurado | Service Operations Manager |
| Ricardo Aguayo | Superintendent |
| Hamlet Ebrahimi | Certified Electrician |
| Ben Belanger | Service Electrician |
| Jorge Portillo | Certified Electrician |
| Jose Chacon | Senior Superintendent |
| Jose Rojas | Senior Superintendent |