## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| VERENGO, INC.,[1] | Case No.: 16-12098 (     ) |
| Debtor. | |

**DEBTOR'S MOTION FOR ORDERS (I)(A) APPROVING PROCEDURES IN CONNECTION WITH THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) SCHEDULING THE RELATED AUCTION AND HEARING TO CONSIDER APPROVAL OF SALE; (C) APPROVING PROCEDURES RELATED TO THE ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (E) APPROVING BREAKUP FEE AND EXPENSE REIMBURSEMENT; AND (F) GRANTING RELATED RELIEF; AND (II) (A) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (C) GRANTING RELATED RELIEF**

The above-captioned debtor and debtor-in-possession (the "**Company**," or the "**Debtor**"), hereby moves (the "**Motion**") this court (the "**Court**") for the entry of orders pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended from time to time, the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the Bankruptcy Court for the District of Delaware (the "**Local Rules**"): (I)(A) approving proposed bidding procedures (the "**Bidding Procedures**")[2] (attached as

---

[1]    The Debtor and the last four digits of its identification number are as follows: Verengo, Inc. 6114. The address of the Debtor's corporate headquarters is 20285 S. Western Avenue, Suite 200 Torrance, CA 90501.

[2]    To the extent of any conflict between this Motion and the Bidding Procedures, the terms of the Bidding Procedures attached to the Bidding Procedures Order shall govern.

**Schedule 1** to the proposed form of Bidding Procedures Order attached hereto as **Exhibit A**) in connection with the sale (the "**Sale**") of all or substantially all of the Debtor's assets (the "**Purchased Assets**"), as described more fully herein; (B) scheduling the related auction (the "**Auction**") and setting the time, date and place of a later hearing to consider approval of the Sale (the "**Sale Hearing**"); (C) approving procedures related to the assumption and assignment (the "**Assumption and Assignment Procedures**") of certain of the Debtor's prepetition executory contracts and unexpired leases of nonresidential real property (collectively, the "**Assigned Contracts**"); (D) approving the form and manner of notice regarding the Sale of the Purchased Assets (the "**Sale Notice**") and the Sale Hearing; (E) approving the proposed bid protections including the termination fee (the "**Breakup Fee**") and expense reimbursement (the "**Expense Reimbursement**"), and (II)(A) authorizing the Sale of the Purchased Assets free and clear of (i) any lien, hypothecation, encumbrance, claim, liability, security interest, interest, mortgage, pledge, restriction, option, easement, encroachment, restriction on transfer or charge (including any conditional sale or other title retention agreement) (collectively, "**Liens**") and (ii) all debts arising under, relating to, or in connection with any acts of the Debtor, claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this case, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, rights with respect to Liens, claims, and encumbrances (a) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtor's or the

purchaser's interests in the Purchased Assets, or any similar rights, or (b) in respect of taxes, restrictions, rights of first refusal, charges or interests of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership ("**Claims**"); (B) approving the assumption and assignment of the Assigned Contracts pursuant to section 365 of the Bankruptcy Code, and waiving the fourteen-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d); and (C) granting such other and further relief as the Court deems just and proper.  In further support of the Motion, the Debtor respectfully represents as follows:

**JURISDICTION, VENUE AND PREDICATES FOR RELIEF**

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157 (b)(2).

2.      The statutory bases for the relief requested herein are sections 105, 363, 365, and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Rule 6004-1.

**Status of the Case and Jurisdiction**

3.      On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

4.      On the Petition Date, the Debtor also filed motions or applications seeking certain typical "first day" orders.  The factual background regarding the Debtor, including its current and historical business operations and the events precipitating this chapter 11

filing, is set forth in detail in the Declaration of Dan Squiller in Support of Chapter 11 Petition and First Day Motions (the "**Squiller Declaration**"), filed concurrently herewith and fully incorporated herein by reference.

5.      The Debtor has continued in possession of its properties and is operating and managing its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No request has been made for the appointment of a trustee or examiner, and a creditors' committee has not yet been appointed in this case.

7.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

**The Debtor's Business Operations**

8.      The Debtor is a privately held corporation organized under Delaware law, headquartered in Torrance, CA with warehouse operations centers in Anaheim and Valencia, CA, and an operations center in Phoenix, AZ.  The Debtor originated from Ken Button and Randy Bishop's purchase of Gemstar Builders in February 2008, which was subsequently renamed Verengo Solar, a d/b/a of Verengo, Inc.  The Debtor's business focuses on the installation of solar photovoltaic systems and is one of the most well-known and respected brands in residential solar.  Moreover, the Debtor offers a range of energy-saving products to help users to conserve the energy generated from their solar systems.  The Debtor also markets and sells solar panels and semiconductor-based micro inverter systems in the United States.  As of August 2016, the Debtor has installed 19,800 systems.  One of the Debtor's key strategic initiatives going forward is coupling energy

storage with solar and the Debtor expects to be a leader in this segment by the time the market matures.

9.     Following the Debtor's inception, operations were opened in California, New Jersey, New York, and Connecticut.  In February 2015, however, all northeast operations were sold to NRG Energy, Inc.; contemporaneously, Northern and Central California operations were shut down.  Notwithstanding, the Debtor remains the largest Southern California-based residential solar provider and its current business focus is California; and the Debtor's processes, operations, and supply chain are scalable for expansion into additional geographies.

10.    For the year ending December 31, 2015, the Debtor achieved $82 million in revenue and 3,200 installations.  Notwithstanding, the Debtor found itself experiencing reduced cash flow in 2016 and strained liquidity as a result.  By pursuing this bankruptcy case using funds made available through the proposed DIP Credit Facility, the Debtor seeks to preserve and capitalize on any extant value of the company by executing a sale of substantially all of its assets under 11 U.S.C. § 363.

## **Prepetition Capital Structure**

### A.    **Secured Loans**

11.    The Debtor had a line of credit with Bridge Bank ("**Bridge**") with a high balance of $9.3M (the "**Secured Loan**"), which balance was reduced over time.  On July 15, 2016, Bridge delivered a Notice of Default to the Company as a result of a payment default.  On August 25, 2016 Bridge froze the account and thereafter funds were swept from the Company's bank account at Bridge, reducing the principal amount of the loan to approximately $983,000.  On August 29, 2016, Bridge delivered a second Notice of Default to the Debtor as a result of various covenant defaults.  Finally, on August 31,

2016, Bridge delivered a third Notice of Default to the Debtor as a result of various payment and covenant defaults. Immediately prior to the Petition Date, the Secured Loan was purchased from Bridge and is now held by Crius Solar Fulfillment, LLC ("**Crius Solar Fulfillment**"). As of the Petition Date, the outstanding aggregate principal amount of the Secured Loan was $2,272,000, which includes protective advances of $1,272,000 that were funded under the Secured Loan immediately prior to the Petition Date.

B.     **The Spruce Loans**

12.     CPF Asset Management, LLC, now known as Spruce Finance ("**Spruce**") loaned $8,500,000 to Verengo via the: (i) *CPF Loan Addendum to Standard Master Installer Contract* dated May 9, 2014; (ii) *Restated and Amended CPF Loan Addendum to Standard Master Installer Contract* dated June 27, 2014; (iii) *Second Restated and Amended CPF Loan Addendum to Standard Master Installer Contract* dated September 12, 2014; (iv) *First Amendment to Second Restated and Amended CPF Loan Addendum to Standard Master Installer Contract* dated January 6, 2015; (v) *Third Restated and Amended CPF Loan Addendum to Standard Master Installer Contract* dated September 23, 2015; and (vi) *First Amendment to Third Restated and Amended CPF Loan Addendum to Standard Master Installer Contract* dated December 2, 2015 (collectively, the "**Spruce Loans**"). Spruce is an independent company that facilitates Verengo's business by purchasing the installation projects from Verengo and acting as a finance company for Verengo's customers. Interest is accruing on the Spruce Loans but no principal payments have been made. The Company believes the Spruce Loans to be junior to the Bridge Bank Loan. Immediately prior to the Petition Date, the Spruce Loans were also acquired by Crius Solar Fulfillment.

C.    **Related Party Debt**

13.    Additional secured notes (the "**Senior Notes**"), believed to be junior to both the Bridge Bank Loan and the Spruce Loan, are as follows:

| | | |
|---|---|---:|
| Angeleno | $ | 11,089,848 |
| ClearSky | | 11,089,848 |
| Arnold Fishman | | 422,191 |
| BainBridge Partners | | 133,460 |
| Org Bowen Campbell & Lauren Bishop | | 10,639 |
| Bishop Living Trust | | 218,695 |
| Total | $ | 22,964,682 |

No principal or interest payments are currently being made on the Senior Notes. Immediately prior to the Petition Date, Crius Solar Fulfillment acquired the Senior Notes held by Angeleno (as defined below) and ClearSky (as defined below).

14.    The Debtor has entered into a DIP Credit Agreement with Crius Solar Fulfillment (in such capacity, the "**DIP Lender**") and is seeking Court authorization for the Debtor to obtain debtor-in-possession financing in the form of a revolving credit facility in the aggregate principal amount of up to $2,000,000 (the "**DIP Credit Facility**", extensions of credit under the DIP Credit Facility, the "**DIP Loans**") on the terms and conditions set forth therein.

**Events Leading to Bankruptcy**

15.    In 2013, the Debtor began to experience quality problems with its installations in the eastern part of the US.  Eventually, Verengo was suspended by the New York State Energy Research and Development Authority (NYSERDA), which prevented the Debtor from activating many of its installed systems until they were reinstalled.  This resulted in additional costs to the Debtor and reduced cash flow.  In January 2015, all northeast operations were sold to NRG Energy, Inc.;

contemporaneously, Northern and Central California operations were shut down.    In addition, between 2012 and 2016 sales and marketing expenses for the origination part of the business were excessive and weighed on the Debtor's cash flow.

16.    In 2016, the Debtor continued to experience reduced cash flow and strained liquidity as a result.  As such, the Debtor implemented a focused business-to-business strategy, eliminating the unprofitable origination business and becoming an engineering, procurement and construction company.  As a result of these initiatives, the Debtor reduced year-over-year operating expenditures by $26.0 million and indirect costs by $3.9 million.  The Debtor also believes that its 2016 EBITDA will be positive by December, with 2017's forecasted cost reductions driven by reduced supply chain costs and volume increase.  The Debtor projects $2.6MM of revenue from new accounts from August through December 2016.

17.    Given the Debtor's inability to independently survive as a going concern, the board of directors of the Debtor has authorized the filing of this Chapter 11 Case to pursue a sale of the Debtor's assets.  In order to fund the continued operations of the Debtor during the completion of the marketing process, the DIP Lender has agreed to provide the Debtor with postpetition financing pursuant to the DIP Credit Agreement.

18.    The Debtor is facing a liquidity crisis requiring a curtailment of production, and is therefore unable to meet customer demand.  The Debtor engaged in substantive discussions with strategic and financial advisors, including several investment banks, to raise outside capital.  These discussions have not proven successful.  While the Debtor has been able to negotiate certain modifications to the terms of certain equity and debt securities issued by the Debtor, the Debtor's financial position remains dire.

19.     The DIP Lender has agreed to terms on which it will provide the Debtor with postpetition financing in the form of the DIP Credit Facility and the DIP Loans.  The DIP Credit Facility and the DIP Loans will provide the Debtor with liquidity as it pursues a sale of its assets under section 363 of the Bankruptcy Code.

### Prepetition Marketing Efforts

20.     In complement to the Debtor's internal restructuring referenced above, the Debtor engaged Roth Capital Partners, LLC ("**Roth**") as an M&A Advisor in April 2016. Specifically, Roth was engaged to analyze the Debtor with respect to a valuation of the company, identify potential third party acquirers, and assist in structuring any transaction. Based on its knowledge of the solar industry, Roth executed a targeted outreach effort to groups it felt were well qualified as potential acquirers.  This resulted in Roth contacting seventeen (17) strategic investors, holding in-depth discussions with seven (7), and securing four (4) groups under non-disclosure agreements.  Despite these efforts, none of these discussions resulted in a transaction.  In September 2016, the Debtor terminated Roth.

### THE PROPOSED SALES PROCESS

21.     The Bidding Procedures were developed consistent with the Debtor's competing needs to expedite the sale process and promote participation and active bidding.  Moreover, the Bidding Procedures reflect the Debtor's objective of conducting the Auction in a controlled, but fair and open, fashion.  As a result, the Debtor has concluded that the sale of its assets pursuant to section 363 of the Bankruptcy Code with an open and competitive auction process will maximize the value of its assets for the benefit of creditors.

### A.    <u>Pre-Auction Bids</u>

22.    The Debtor solicited a pre-auction bid from Crius Solar Fulfillment resulting in the Debtor's entry into a stalking horse agreement (the "**<u>Stalking Horse Agreement</u>**"; attached hereto as **<u>Exhibit C</u>**) with Crius Solar Fulfillment (in such capacity, the "**<u>Stalking Horse Purchaser</u>**").  The members of Crius Solar Fulfillment are Crius Energy Corporation, Angeleno Investors III—Verengo Solar, L.P. ("**<u>Angeleno</u>**"), ClearSky Funding I LLC ("**<u>ClearSky</u>**"), and Spruce.  Crius Solar Fulfillment was formed on or about September 22, 2016 to pursue the acquisition of the Secured Loan and the provision of the DIP Credit Facility, as well as to serve as the stalking horse purchaser of the Debtor's assets.  In connection with the formation of Crius Solar Fulfillment, Angeleno, ClearSky and Spruce contributed their holdings of the Spruce Loans and the Senior Notes held by them to Crius Solar Fulfillment.

23.    Crius Solar Fulfillment intends to credit bid $11.7 million comprised of (x) the amount outstanding under the DIP Credit Agreement at the time of closing, plus (y) the amount of the Secured Loan totaling $2,272,000, plus (z) such amount of Senior Notes necessary to total, when combined with the credit bid amounts from clauses (x) and (y), $11.7 million, for the purchase of all or substantially all of Verengo's assets.

24.    The Debtor intends to retain SSG Advisors, LLC as its investment banker to, among other things, shop around the Stalking Horse Purchaser's offer in an effort to achieve the highest bid for the Debtor's assets.

### B.    <u>Proposed Timeline</u>

25.    The Debtor desires to receive the greatest value for the Purchased Assets. Accordingly, the Debtor intends to offer the assets for sale in the hope that higher and better bids are generated for all or a portion of the Purchased Assets.

26.    The Debtor proposes the following timeline in connection with the relief sought in this Motion:

| EVENT | DATE |
|---|---|
| Bidding Procedures Hearing | Within 24 days of the Petition Date |
| Objection Deadline in Connection with Sale of Purchased Assets and Cure Amounts | Within 48 days of the Petition Date |
| Bid Deadline | Within 50 days of the Petition Date |
| Auction Date (if necessary) | Within 52 days of the Petition Date |
| Sale Hearing. | Within 55 days of the Petition Date |

27.    Absent a prompt sale pursuant to the proposed procedures and timeline, the Debtor believes that the going concern value of the Purchased Assets may be significantly compromised, rendering the possibility of a sale unlikely.  The Debtor therefore submits that the proposed timeline is more than sufficient to complete a fair and open process that will maximize value for the Debtor's assets while at the same time preserve the going concern value.

**RELIEF REQUESTED**

28.    By this Motion, the Debtor seeks orders: (i)(a) authorizing and approving the Bidding Procedures, (b) scheduling the Auction and the Sale Hearing; (c) approving the form and manner of Sale Notice attached to the Bidding Procedures Order as **Schedule 3**, (d) approving the Assumption and Assignment Procedures and the form and manner of the Cure Notice (as defined below), and (e) approving the Breakup Fee and Expense Reimbursement (such order, substantially in the form attached hereto as **Exhibit A** the "**Bidding Procedures Order**"); and (ii) authorizing and approving (a) the Sale of the Debtor's rights, title and interests in the Purchased Assets free and clear of all Liens and Claims, and (b) the assumption and assignment of the Assigned Contracts (such

order, substantially in the form attached hereto as **Exhibit B**, the "**Sale Order**"); and (iii)

granting it such other relief as the Court deems just and proper.

29.    Local Rule 6004-1 states that a sale motion:

> must highlight material terms, including but not limited to
> (a) whether the proposed form of sale order and/or the
> underlying purchase agreement constitutes a sale or
> contains . . . [certain enumerated provisions], (b) the
> location of any such provision in the proposed form of
> order or purchase agreement, and (c) the justification for
> the inclusion of such provision."

Del. Bankr. L.R. 6004-1(b)(iv).  In addition, "[a] debtor may file a Sale Procedures

Motion seeking approval of an order . . . approving bidding and auction procedures either

as part of the Sale Motion or by a separate motion in anticipation of an auction and a

proposed sale."  Del. Bankr. L.R. 6004-1(c).  As with a sale motion, the Local Rules

provide that a debtor must highlight certain bid procedures order provisions in the motion

seeking approval of the same.  Del. Bankr. L.R. 6004-1(c)(i).

## THE STALKING HORSE AGREEMENT

30.    Pursuant to this Motion and Section 2.1 of the Stalking Horse Agreement,

the Debtor is offering the Purchased Assets for sale which are comprised of all or

substantially all of the Debtor's assets (excluding the Excluded Assets (as defined in the

Stalking Horse Agreement)).

31.    The Stalking Horse Agreement contemplates the sale of the Purchased

Assets, subject to higher and/or better bids, on the following material terms:[3]

---

[3]    The highlighted terms and summary of the Stalking Horse Agreement is provided for the benefit of the Court and other parties in interest.  The Stalking Horse Agreement is incorporated herein by reference.  To the extent of any conflict between this summary and the Stalking Horse Agreement, the terms of the Stalking Horse Agreement shall govern.  Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to them in the Stalking Horse Agreement.

| | |
|---|---|
| **Stalking Horse Purchaser** | Crius Solar Fulfillment.  The members of Crius Solar Fulfillment are Crius Energy Corporation, Angeleno, ClearSky, and Spruce. |
| **Purchase Price** | $11.9 million. |
| **Agreements with Management** | N/A |
| **Releases** | N/A |
| **Auction to be Conducted** | As described more thoroughly in the Bidding Procedures, the Debtor intends to conduct an open auction process if one or more Qualified Bids are received. |
| **Closing and Other Deadlines** | Closing deadline: 75 days from the Petition Date. |
| **Good Faith Deposit** | The Stalking Horse Purchaser is not required to make a good-faith deposit, but Qualified Competing Bidders are required to tender a cash deposit in the amount of ten percent (10%) of the proposed purchase price. |
| **Interim Arrangements with Proposed Buyer** | The Sale does not contemplate the Debtor entering into any interim agreements or arrangements with the Stalking Horse Purchaser (although the Stalking Horse Purchaser is the Debtor's Proposed DIP Lender). |
| **Use of Proceeds** | The Sale does not contain any provisions relating to the Debtor's use of the proceeds. |
| **Record Retention** | The Sale does not contain any provisions relating to record retention. |
| **Sale of Avoidance Actions** | The Bidding Procedures contemplate the sale of certain causes of action including Avoidance Actions. |
| **Requested Findings as to Successor Liability** | The Sale Order provides that Purchasers will not have any successor or transferee liability whatsoever for liabilities of the Debtor (whether under federal or state law or otherwise) as a result of the Sale.<br><br>Sale Order, ¶ 10. |
| **Credit Bid** | The Stalking Horse Purchaser intends to credit bid $11.7 |

| | million comprised of (x) the amount outstanding under the DIP Credit Agreement at the time of closing, plus (y) the amount of the Secured Loan totaling $2,272,000, plus (z) such amount of Senior Notes necessary to total, when combined with the credit bid amounts from clauses (x) and (y), $11.7 million). |
|---|---|
| **Relief from Bankruptcy Rule 6004(h)** | The Debtor is seeking relief from the fourteen-day stay provided by Bankruptcy Rule 6004(h).<br><br>Sale Order, ¶ 24. |

32.     In recognition of the Stalking Horse Purchaser's expenditure of time, energy, and resources, the Debtor has agreed that if the Stalking Horse Purchaser is not the Successful Bidder (as defined in the Bidding Procedures), the Debtor will pay the Stalking Horse Purchaser an amount in cash equal to (i) $475,000 as more fully described in the Stalking Horse Agreement (the "**Breakup Fee**") plus (ii) the aggregate amount of the reasonable, actual, and necessary, out-of-pocket expenses paid or incurred by the Stalking Horse Purchaser and its affiliates relating to or in connection with its bid (the "**Expense Reimbursement**"), subject to a cap of $175,000.   The Debtor has further agreed that its obligation to pay the Breakup Fee and Expense Reimbursement pursuant to the Stalking Horse Agreement shall (i) survive termination of the Stalking Horse Agreement, (ii) to the extent owed by the Debtor, constitute an administrative expense claim under section 503(b) of the Bankruptcy Code, and (iii) be payable within two (2) business days under the terms and conditions of the Stalking Horse Agreement and the Bidding Procedures Order, notwithstanding section 507(a) of the Bankruptcy Code.

## PROPOSED BIDDING PROCEDURES

33.     The Debtor believes that it is imperative that it promptly moves forward in hope that higher and better offers are generated for the Purchased Assets.   Accordingly,

the Bidding Procedures (as summarized below and attached hereto as **Schedule 1**) were developed consistent with the Debtor's need to expedite the sale process, but with the objective of promoting further active bidding that will result in the highest or best offer for the Purchased Assets.   Moreover, the Bidding Procedures reflect the Debtor's objective of conducting the Auction in a controlled, but fair and open, fashion that promotes interest in the Purchased Assets by financially-capable, motivated bidders who are likely to close a transaction.

### A.    Provisions Governing Qualifications of Bidders

34.    Unless otherwise ordered by the Court, in order to participate in the bidding process, prior to the Bid Deadline (defined below), each person, other than the Stalking Horse Purchaser, who wishes to participate in the bidding process (a "**Potential Bidder**") must deliver the following to the Notice Parties (as defined below):

> (i)    a written disclosure of the identity of each entity including all affiliates, equity sources or other parties that will be or is associated with bidding for the Purchased Assets or otherwise participating in connection with such bid and the complete terms of any such participation; and

> (ii)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtor to a Potential Bidder) in form and substance satisfactory to the Debtor, which shall inure to the benefit of any purchaser of the Purchased Assets; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions.

35.    A Potential Bidder that delivers the documents and information described above and that the Debtor determines in its reasonable business judgment, after consultation with its advisors, is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale, will be deemed a "**Qualified**

**Bidder**." The Debtor will limit access to due diligence to those parties it believes, in the exercise of its reasonable judgment, are pursuing the transaction in good faith.

36.    As promptly as practicable after a Potential Bidder delivers all of the materials required above (and in any event no later than two (2) business days thereafter), the Debtor will determine and will notify the Potential Bidder and the Notice Parties if such Potential Bidder is a Qualified Bidder.

### B.    Due Diligence

37.    The Debtor will afford any Qualified Bidder such due diligence access or additional information as the Debtor, in consultation with its advisors, deems appropriate, in its reasonable discretion.   The Debtor must promptly advise the Stalking Horse Purchaser in the event any other Qualified Bidder receives diligence the Stalking Horse Purchaser has not previously received and shall promptly be provided with access to such diligence materials.

38.    The due diligence period shall end on the Bid Deadline.    For the avoidance of doubt, neither the Debtor nor any of its respective representatives shall be obligated to furnish any due diligence information to any person other than a Qualified Bidder.

### C.    Provisions Governing Qualified Bids

39.    A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "**Qualified Bid**"):

> (i)   it fully discloses the identity of the Qualified Bidder;
>
> (ii)  it states that the applicable Qualified Bidder offers to purchase the Purchased Assets upon terms and conditions that the Debtor

reasonably determines are at least as favorable to the Debtor as those set forth in the Stalking Horse Agreement;

(iii) it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and the Back-Up Bidder (defined below), provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder, then the offer shall remain irrevocable until the earlier of (i) the closing of the transaction with the Successful Bidder and (ii) the date that is fifteen (15) business days after entry of the Sale Order with respect to the Successful Bidder and sixteen (16) business days after entry of the Sale Order with respect to the Back-Up Bidder;

(iv) confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

(v) it sets forth each regulatory and third-party approval required for the Qualified Bidder to consummate the transaction and the time period within which the Qualified Bidder expects to receive such approvals;

(vi) it includes a duly authorized and executed copy of a purchase agreement (a "**Purchase Agreement**"), including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "**Purchase Price**"), together with all exhibits and schedules thereto, together with copies marked ("**Marked Agreement**") to show any amendments and modifications to the Stalking Horse Agreement and the proposed order to approve the sale by the Court Motion; provided however, that such Purchase Agreement shall not include any financing or diligence conditions;

(vii) it includes written evidence of sufficient cash on hand to fund the purchase price or sources of immediately available funds that are not conditioned on further third party approvals or commitments, that will allow the Debtor to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Purchase Agreement; such written evidence shall include the most current audited and the most current unaudited financial statements, or such other financial information as may be acceptable to the Debtor in its reasonable discretion (collectively, the "**Financials**") of the Qualified Bidder, or, if the Qualified Bidder is an entity formed for the purpose of acquiring the Purchased Assets, the Financials of the Qualified Bidder's equity holder(s) or other financial backer(s);

(viii)  it provides for a cash purchase price at least $250,000 (the "**Minimum Overbid**") in excess of the aggregate consideration to be received by or for the benefit of the Debtor's estate upon consummation of the Stalking Horse Agreement ((a) $200,000 in cash, plus (b) cash in an amount sufficient to satisfy the Debtor's secured obligations being credit bid by the Stalking Horse Purchaser under the Stalking Horse Agreement (specifically, $11.7 million comprised of (x) the amount outstanding under the DIP Credit Agreement at the time of closing, plus (y) the amount of the Secured Loan totaling $2,272,000, plus (z) such amount of Senior Notes necessary to total, when combined with the credit bid amounts from clauses (x) and (y), $11.7 million), and otherwise has a value to the Debtor, in the Debtor's exercise of its reasonable business judgment, after consultation with its advisors, that is greater or otherwise better than the value offered under the Stalking Horse Agreement including impact of the liabilities assumed in the Stalking Horse Agreement.  The Minimum Overbid represents the sum of (A) the amount of the Breakup Fee (as defined below) of $475,000 and Expense Reimbursement of $175,000, plus (B) $250,000 plus (C) the Purchase Price of $11,900,000;

(ix)  it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to assume and provides for the Qualified Bidder to pay related cure costs;

(x)  it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

(xi)  it includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Purchase Agreement; and (D) is not entitled to any expense reimbursement, breakup fee, or similar type of payment in connection with its bid;

(xii)  it includes evidence, in form and substance reasonably satisfactory to the Debtor, of authorization and approval from the Qualified

Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Purchase Agreement;

(xiii)   it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtor), certified check or such other form acceptable to the Debtor, payable to the order of the Debtor (or such other party as the Debtor may determine) in an amount equal to ten percent (10%) of the Purchase Price;

(xiv)   it contains in writing that the Qualified Bidder will pay off, in full, the DIP loan and become the DIP lender, with such payoff to occur within three (3) days of the Sale Hearing;

(xv)   it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Debtor;

(xvi)   it states that the Qualified Bidder consents to the jurisdiction of the Bankruptcy Court;

(xvii)   it contains such other information reasonably requested by the Debtor; and

(xviii)   it is received prior to the Bid Deadline.

40.   Notwithstanding the foregoing, the Stalking Horse Purchaser is deemed a Qualified Bidder and the Stalking Horse Agreement is deemed a Qualified Bid, for all purposes in connection with the Bidding Procedures, the Auction, and the Sale. The Stalking Horse Purchaser shall not be required to take any further action in order to participate in the Auction (if any) or, if the Stalking Horse Purchaser is the Successful Bidder, to be named the Successful Bidder at the Sale Hearing.

41.   The Debtor shall notify the Stalking Horse Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and with respect to each Qualified Bidder that submitted a bid as to whether such Qualified Bidder's bid constitutes a Qualified Bid) no later than two (2) business days following the expiration of the Bid Deadline.

42.     Subject to the terms of the Stalking Horse Agreement and the Bidding Procedures, the Debtor reserves the right to adopt, implement, and/or waive such other, additional or existing procedures or requirements that serves to further an orderly Auction and bid process without further notice except to the Stalking Horse Purchaser and the other Qualified Bidders (such other Qualified Bidders referred to herein as "**Qualified Competing Bidders**").

43.     The Debtor requests authority to solicit bids for the Purchased Assets utilizing the Bidding Procedures, substantially in the form attached as **Schedule 1** to the Bidding Procedures Order and summarized below.  The Bidding Procedures describe, among other things, the assets to be sold, the manner in which bids become Qualified Bids, the coordination of diligence efforts among potential bidders, the Debtor, and its advisors and management, the receipt and negotiation of bids received, the conduct of any auction, and the selection and approval of the Successful Bidder (as defined in the Bidding Procedures).

44.     The Bidding Procedures were developed consistent with the Debtor's competing needs to conduct an expedited sale process and to promote participation and active bidding.  Moreover, the Bidding Procedures reflect the Debtor's objective of conducting an auction in a controlled, but fair and open, fashion, while ensuring that the highest and best bid is generated for the Purchased Assets.

45.     The material terms of the Bidding Procedures are as follows:[4]

---

[4]     The following description of the Bidding Procedures is a summary of the terms set forth in the Bidding Procedures attached to the Bidding Procedures Order as **Schedule 1**.  To the extent of any conflict between this summary and the Bidding Procedures, the terms of the Bidding Procedures attached to the Bidding Procedures Order shall govern.  Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Bidding Procedures.

| | |
|---|---|
| **Provisions Governing Qualification of Bidders** | *Obligation to Deliver Financial Information to Debtor.* Any Potential Bidder who desires to become a bidder that is qualified to participate in the Auction and make a bid must submit to the Debtor:<br><br>(a) a written disclosure of the identity of each entity including all affiliates, equity sources or other parties that will be or is associated with bidding for the Purchased Assets or otherwise participating in connection with such bid and the complete terms of any such participation; and<br><br>(b) an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtor to a Potential Bidder) in form and substance satisfactory to the Debtor, which shall inure to the benefit of any purchaser of the Purchased Assets; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions. |
| **Provisions Governing Qualified Bids** | *Bid Deadline.* The Debtor proposes that the Bid Deadline be set no later than 50 days after the Petition Date.<br><br>*Form of Bid.* In order to be eligible to participate in the Auction, a Bidder must deliver to the Notice Parties a written offer, which must provide or otherwise comply with, at minimum, the items noted below to be deemed a "Qualified Bid":<br><br>(a) it fully discloses the identity of the Qualified Bidder;<br><br>(b) it states that the applicable Qualified Bidder offers to purchase the Purchased Assets upon terms and conditions that the Debtor reasonably determines are at least as favorable to the Debtor as those set forth in the Stalking Horse Agreement;<br><br>(c) it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and the Back-Up Bidder (defined below), provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder, then the offer shall remain irrevocable until the earlier of (i) the closing of the transaction with the Successful Bidder and (ii) the date that is fifteen (15) business days after entry of the Sale Order with respect to the Successful Bidder and sixteen |

(16) business days after entry of the Sale Order with respect to the Back-Up Bidder;

(d)    confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

(e)    it sets forth each regulatory and third-party approval required for the Qualified Bidder to consummate the transaction and the time period within which the Qualified Bidder expects to receive such approvals;

(f)    it includes a duly authorized and executed copy of a Purchase Agreement, including the Purchase Price expressed in U.S. Dollars, together with all exhibits and schedules thereto, together with a Marked Agreement to show any amendments and modifications to the Stalking Horse Agreement and the proposed order to approve the sale by the Court Motion; provided however, that such Purchase Agreement shall not include any financing or diligence conditions;

(g)    it includes written evidence of sufficient cash on hand to fund the purchase price or sources of immediately available funds that are not conditioned on further third party approvals or commitments, that will allow the Debtor to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Purchase Agreement; such written evidence shall include the Qualified Bidder's Financials, or, if the Qualified Bidder is an entity formed for the purpose of acquiring the Purchased Assets, the Financials of the Qualified Bidder's equity holder(s) or other financial backer(s);

(h)    it provides for a cash purchase price at least $250,000 (the "**Minimum Overbid**") in excess of the aggregate consideration to be received by or for the benefit of the Debtor's estate upon consummation of the Stalking Horse Agreement ((a) $200,000 in cash, plus (b) cash in an amount sufficient to satisfy the Debtor's secured obligations being credit bid by the Stalking Horse Purchaser under the Stalking Horse Agreement (specifically, $11.7 million comprised of (x) the amount outstanding under the DIP Credit Agreement at the time of closing, plus (y) the amount of the Secured Loan totaling

$2,272,000, plus (z) such amount of Senior Notes necessary to total, when combined with the credit bid amounts from clauses (x) and (y), $11.7 million), and otherwise has a value to the Debtor, in the Debtor's exercise of its reasonable business judgment, after consultation with its advisors, that is greater or otherwise better than the value offered under the Stalking Horse Agreement including impact of the liabilities assumed in the Stalking Horse Agreement. The Minimum Overbid represents the sum of (A) the amount of the Breakup Fee (as defined below) of $475,000 and Expense Reimbursement of $175,000, plus (B) $250,000 plus (C) the Purchase Price of $11,900,000;

(i)    it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to assume and provides for the Qualified Bidder to pay related cure costs;

(j)    it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

(k)    it includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Purchase Agreement; and (D) is not entitled to any expense reimbursement, breakup fee, or similar type of payment in connection with its bid;

(l)    it includes evidence, in form and substance reasonably satisfactory to the Debtor, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Purchase Agreement;

|  | (m)   it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtor), certified check or such other form acceptable to the Debtor, payable to the order of the Debtor (or such other party as the Debtor may determine) in an amount equal to ten percent (10%) of the Purchase Price; |
|  | (n)   it contains in writing that the Qualified Bidder will pay off, in full, the DIP loan and become the DIP lender, with such payoff to occur within three (3) days of the Sale Hearing; |
|  | (o)   it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Debtor; |
|  | (p)   it states that the Qualified Bidder consents to the jurisdiction of the Bankruptcy Court; |
|  | (q)   it contains such other information reasonably requested by the Debtor; and |
|  | (r)   it is received prior to the Bid Deadline. |
| **Bid Protections** | *Breakup Fee in an amount of $475,000 and Expense Reimbursement in an amount of $175,000.*<br><br>*Bidding Increments*.   Bidding at the Auction will start at the Auction Baseline Bid and will continue with minimum bid increments of $100,000. |
| **Modification of Bidding Procedures** | *Modification*.   The Bidding Procedures may be modified by the Debtor (along with its advisors) with the consent of the Stalking Horse Purchaser. |
| **Closing With Alternative Back-Up Bidder(s)** | *Irrevocable Bid*.   If an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Qualified Bid to the Successful Bidder, as determined by the Debtor in the exercise of its business judgment, at the Auction shall be required to serve as the Back-Up Bidder and keep such bid open and irrevocable until sixteen (16) business days after entry of the Sale Order; provided that the Stalking Horse Purchaser shall not be required to be the Back-Up Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtor will be authorized, but not required, to |

| | |
|---|---|
| | consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court. |
| **Provisions Governing the Auction** | *Date/Time/Place of Auction.*  In the event the Debtor receives one or more Qualified Bids (other than the Qualified Bid from the Stalking Horse Purchaser), the Debtor proposes to hold the Auction no later than 52 days after the Petition Date, at the offices of Bayard, P.A., 222 Delaware Avenue, Suite 900, Wilmington, Delaware 19801. |
| | *No Collusion.*  Each Qualified Bidder will be required to confirm that it has not engaged in any collusion with respect to the Auction or the proposed sale. |
| | *Participation and Attendance.*  The Debtor and its representatives, the Stalking Horse Purchaser and any other Qualified Bidder shall participate at the Auction in person, and only the Purchaser and such other Qualified Bidders who have timely submitted a Qualified Bid will be entitled to make any subsequent bids at the Auction. |
| | At least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtor whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder and the Back-Up Bidder  at the conclusion of the Auction. At least one (1) business day prior to the Auction, the Debtor will identify to the Stalking Horse Purchaser and all other Qualified Bidders which Qualified Bid the Debtor believes in its reasonable discretion is the highest or otherwise best offer (the "**Starting Bid**"). |
| | All Qualified Bidders who have timely submitted (e) Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person. |
| | The Debtor, after consultation with its advisors and with the consent of the Stalking Horse Purchaser, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, |

<table>
<tr>
<td></td>
<td>

provided that such rules are (i) not inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

Bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "**Subsequent Bid**") providing a net value to the estate of at least an additional $100,000 above the prior bid. After the first round of bidding and between each subsequent round of bidding, the Debtor shall announce the bid that it believes to be the highest or otherwise better offer (the "**Leading Bid**"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Qualified Bidders will not have the opportunity to pass. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids, the Debtor will give effect to the Breakup Fee and Expense Reimbursement payable to the Stalking Horse Purchaser as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtor.

*Transcription*.    The Debtor shall arrange for the Auction to be transcribed.

</td>
</tr>
</table>

46.    The Debtor submits that implementation of the Bidding Procedures will not chill bidding for the Purchased Assets.  Rather, approval of the Bidding Procedures is in the best interests of the Debtor, its estate, and its creditors in that it provides a structure and format for other potentially interested parties to formulate a bid for the Purchased Assets.  Failure to approve the Bidding Procedures may jeopardize the Sale to Stalking Horse Purchaser to the detriment of the Debtor's creditors, employees, customers and vendors.

**C.    The Notice Procedures**

47.    The Debtor proposes to give notice within two (2) business days after the entry of the Bidding Procedures Order, of the time and place of the Auction, the time and place of the Sale Hearing, and the objection deadline for the Sale Hearing by sending the

*Notice of Sale Procedures, Auction Date and Sale Hearing*, substantially in the form attached as **Schedule 3** to the Bidding Procedures Order, to (a) the US Trustee, (b) any Official Committee of Unsecured Creditors, (c) any parties requesting notices in this case pursuant to Bankruptcy Rule 2002, (d) counsel to the Stalking Horse Purchaser, and (e) all Potential Bidders.

### D.      **The Assumption and Assignment Procedures**

48.      The Debtor proposes a set of procedures to facilitate the Sale which would involve the assumption and assignment of the Assigned Contracts.   The proposed Assumption and Assignment Procedures are contained in the Notice to Counterparties to Executory Contracts and Unexpired Leases of the Debtor That May Be Assumed and Assigned (the "**Cure Notice**"), attached to the Bidding Procedures Order as **Schedule 4**. The Debtor will serve the Cure Notice on all non-debtor counterparties to the Assigned Contracts or their counsel (if known) within two (2) business days after entry of the Bidding Procedures Order.

49.      The Debtor will attach to the Cure Notice its calculations of the undisputed cure amounts, if any, that the Debtor believes must be paid to cure all prepetition defaults under all Assigned Contracts (the "**Cure Amount**").   The Debtor proposes that if any counterparty to an Assigned Contract objects for any reason to the assumption and assignment of an Assigned Contract (an "**Assumption Objection**"), such counterparty must file and serve such Assumption Objection so as to be received by the Notice Parties by no later than (the "**Assumption Objection Deadline**"): (i) 7 days prior to the date of the Auction, provided, however, if any bidder other than the Stalking Horse Bidder is the Successful Bidder, then that any counterparty may file and serve an objection to the assumption and assignment of the Assigned Contract solely with respect

to the Successful Bidder's ability to provide adequate assurance of future performance under the Assigned Contract up to the time of the Sale Hearing, or raise it at the Sale Hearing; or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date set forth in the motion to assume such Assigned Contract if such contract is to be assumed and assigned after the Sale Hearing). The Court will make any and all determinations concerning adequate assurance of future performance under the Assigned Contracts pursuant to sections 365(b) and (f)(2) of the Bankruptcy Code at the Sale Hearing.

50.     The Debtor requests that unless the counterparty to any Assigned Contract timely files and serves an Assumption Objection, such non-debtor party should (a) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Assigned Contract, and the Debtor shall be entitled to rely solely upon the Cure Amount, and (b) be forever barred and estopped from asserting or claiming against the Debtor, the Stalking Horse Purchaser or the Successful Bidder, as the case may be, or any other assignee of the Assigned Contract that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied with respect to such Assigned Contract.

51.     In the event that an Assumption Objection is timely filed and served, such Assumption Objection must set forth with specificity each and every asserted default in any executory contract or unexpired lease and the monetary cure amount asserted by such counterparty to the extent it differs from the amount, if any, specified by the Debtor in the Cure Notice. After receipt of the Assumption Objection, the Debtor will attempt to reconcile any differences in the Cure Amount believed by the counterparty to exist. In

the event, however, the Debtor and the counterparty cannot consensually resolve the Cure Amount, the Debtor will segregate any disputed Cure Amounts ("**Disputed Cure Amounts**") pending the resolution of any such disputes by the Court or mutual agreement of the parties.  Assumption Objections may be resolved by the Court at the Sale Hearing, or at a separate hearing either before or after the Sale Hearing.

52.     In the event that the Successful Bidder is not the Stalking Horse Purchaser, immediately after the conclusion of the Auction, the Debtor will serve notice identifying the Successful Bidder upon each counterparty to an executory contract or unexpired lease to be assumed and assigned to the Successful Bidder.  In this circumstance, each counterparty may object to the assumption and assignment of such executory contract or unexpired lease at any time before the Sale Hearing.

53.     Notwithstanding anything to the contrary herein, through the date of closing, the Stalking Horse Purchaser or the Successful Bidder, as the case may be, shall have the right to exclude from the Purchased Assets any of the Assigned Contracts, and in such case any such excluded Assigned Contract shall constitute an Excluded Asset (as defined in the Stalking Horse Agreement) and shall not constitute, for any purpose whatsoever, a Purchased Asset and shall have the right to include any executory contract and/or unexpired lease and, in such case any such included executory contract and/or unexpired lease shall constitute a Purchased Asset to be purchased.  Neither the Stalking Horse Purchaser nor the Successful Bidder shall incur any liability, obligation, or debt in connection with or related to such Excluded Asset.

54.     To the extent that a non-debtor counterparty to an Assigned Contract was not provided with a Cure Notice (any such contract or lease a "**Previously Omitted**

**Contract**"), the Debtor will notify the Stalking Horse Purchaser or the Successful Bidder, as the case may be, within three (3) business days of the omission.  The Debtor shall serve a notice (the "**Previously Omitted Contract Notice**") to the counterparties to the Previously Omitted Contract indicating the Debtor's intent to assume and assign the Previously Omitted Contract.  The counterparties will have fourteen (14) days to object to the Cure Amount or the assumption.  If the parties cannot agree on a resolution, the Debtor will seek an expedited hearing before the Court to determine the Cure Amount and approve the assumption.  If there is no objection, then the counterparties will be deemed to have consented to the assumption and assignment and the Cure Amount, and such assumption and assignment and the Cure Amount shall be deemed approved by the Sale Order without further order of this Court.

**E.**      **Request to Set a Date for the Sale Hearing**

55.      The Debtor intends to present the Successful Bid and the Back-Up Bid, as the case may be, for approval by the Court pursuant to the provisions of sections 105, 363 and 365 of the Bankruptcy Code at the Sale Hearing to be scheduled by the Court.  The Debtor respectfully requests that any such Sale Hearing be scheduled no later than 55 days following the Petition Date.  Upon the failure to consummate a sale of the Purchased Assets after the Sale Hearing because of the occurrence of a breach or default of the Successful Bid, as the case may be, or the non-approval of this Court, the next highest or otherwise best Back-Up Bid, if any, as disclosed at the Sale Hearing, shall be deemed the Successful Bid without further order of the Court, and the parties shall be authorized to consummate the transaction contemplated by the Back-Up Bid.

56.     The Debtor further requests, pursuant to Bankruptcy Rule 9014, that any and all objections to the relief to be considered at the Sale Hearing be filed seven days prior to the Sale Hearing.

**F.      Sale Free and Clear of Liens and Claims**

57.     The Debtor has agreed, and therefore requests that the Court hold, that upon Closing the conveyance of the Debtor's interest in the Purchased Assets will be a legal, valid, and effective transfer of such Purchased Assets, and, to the fullest extent permitted by sections 105, 363(f) and 365 of the Bankruptcy Code, or other applicable law, vests or will vest the Stalking Horse Purchaser with all right, title, and interest of the Debtor in and to the Purchased Assets free and clear of Liens and Claims (except for Assumed Liabilities).

58.     All Liens and Claims of any kind or nature whatsoever will attach to the proceeds of the Sale (the "**Proceeds**") with the same force, validity, priority and effect, if any, as the Liens and Claims formerly had against the Purchased Assets, if any, subject to the Debtor's ability to challenge the extent, validity, priority and effect of the Liens and Claims.

**BASIS FOR RELIEF**

**A.      The Sale of the Purchased Assets Is a Product of the Debtor's Reasonable Business Judgment**

59.     Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 365(b).  Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

60.     Virtually all courts have held that approval of a proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the debtor.  *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *see also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); *Vecchio v. Stroud Ford, Inc. (In re Stroud Ford, Inc.)*, 205 B.R. 722 (Bankr. M.D. Pa. 1996); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063 (2d Cir. 1983); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

61.     The "sound business reason" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the debtor has obtained a fair and reasonable price; and (4) good faith.  *See generally Abbotts Dairies*, 788 F.2d 143; *see also Titusville Country Club*, 128 B.R. at 399; *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Phoenix Steel Corp.*, 82 B.R. at 335-36; *see also Stephens Indus.*, 789 F.2d at 390; *Lionel*, 722 F.2d at 1071.  A debtor's showing of a sound business purpose need not be unduly exhaustive, but rather a debtor is "simply required to justify the proposed disposition with sound business reasons."  *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.  *Lionel*, 722 F.2d at 1071.

62.     Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of the debtor's assets.  *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court

to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that the bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

63.    The proposed procedures for, and the sale of the Debtor's interests in the Purchased Assets, meet the "sound business reason" test.  First, sound business purposes justify the sale.  The Debtor believes that a prompt sale of the Purchased Assets conducted pursuant to the Bidding Procedures presents the best opportunity to realize the maximum value of the Purchased Assets for distribution to the Debtor's estate and the Debtor's creditors.

64.    The Bidding Procedures are also justified by sound business purposes. The Bidding Procedures are designed to maximize the value received for the Purchased Assets.  The procedures proposed herein allows for a timely and efficient auction process, while satisfying the various notice requirements of the Bankruptcy Rules and providing sufficient time for parties-in-interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.  Finally, the Bidding Procedures satisfy the good faith requirement of *Abbotts Dairies*.

65.    The Debtor believes it is in the best interests of its estate, creditors, customers and employees to commence a bidding process immediately, as the Debtor has limited funding and resources to maximize the value of its assets.  It is unlikely that the Debtor will be able to continue operating beyond the period of this proposed bidding process without additional funding, the source of which would be uncertain.  The Debtor

has limited production operations and urgent cash needs.  The purchase of raw materials and ongoing production operations, combined with a sale of the Debtor's assets, will help restore confidence with those parties the Debtor has done business with in the past.  For these reasons, the Debtor has determined, based on its business judgment, that the best way to maximize the value of its estate for the benefit of its creditors, customers, employees and other parties in interest is through the immediate marketing and sale of the Purchased Assets pursuant to the Bidding Procedures.

66.    The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.  The Debtor submits that the opportunity for competitive bidding embodied in the Bidding Procedures will generate the highest or otherwise best offer for the Purchased Assets.

67.    The Debtor believes that a prompt sale process is the best way to maximize the value of the Debtor's assets for the benefit of its estates, creditors and other stakeholders.  The proposed Bidding Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Purchased Assets.

68.    As set forth above, the Debtor has demonstrated compelling and sound business justifications for the sale of the Purchased Assets pursuant to the Bidding Procedures.  The Debtor therefore requests that the Court approve the proposed procedures for sale of the Purchased Assets to the highest or otherwise best bidder at the

Auction and approve the Sale presented to the Court at the Sale Hearing and authorize the

Debtor to take such other steps as are necessary to consummate the Sale.

## B.    The Stalking Horse Purchaser Should be Granted the Protection of Section 363(m) of the Bankruptcy Code

69.    The Debtor requests the Court to find that the Stalking Horse Purchaser is

entitled to the benefits and protections provided by section 363(m) of the Bankruptcy

Code in connection with the Sale.

70.    Specifically, section 363(m) of the Bankruptcy Code provides that:

> [t]he reversal or modification on appeal of an authorization
> under subsection (b) or (c) of this section of a sale or lease
> of property does not affect the validity of a sale or lease
> under such authorization to an entity that purchased or
> leased such property in good faith, whether or not such
> entity knew of the pendency of the appeal, unless such
> authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).  Section 363(m) of the Bankruptcy Code thus protects the Stalking

Horse Purchaser of assets sold pursuant to section 363 from the risk that it will lose its

interest in the purchased assets if the order allowing the sale is reversed on appeal.

71.    While the Bankruptcy Code does not define "good faith," the Third Circuit

in *Abbotts Dairies* held that:

> [t]he requirement that a purchaser act in good faith . . .
> speaks to the integrity of his conduct in the course of the
> sale proceedings. Typically, the misconduct that would
> destroy a purchaser's good faith status at a judicial sale
> involves fraud, collusion between the purchaser and other
> bidders or the trustee, or an attempt to take grossly unfair
> advantage of other bidders.

788 F.2d at 147 (citations omitted); *see generally Marin v. Coated Sales, Inc., (In re*

*Coated Sales, Inc.*), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party must

demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other

bidders" to show lack of good faith); *see also In re Pisces Leasing Corp.*, 66 B.R. 671,

673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an

actor's] conduct during the sale proceedings") (*quoting In re Rock Indus. Mach. Corp.*,

572 F.2d 1195, 1198 (7th Cir. 1978)).

72.     As the Debtor will demonstrate at the Sale Hearing, the Stalking Horse

Purchaser is entitled to all of the protections of section 363(m) of the Bankruptcy Code.

**C.     The Breakup Fee and Expense Reimbursement are Necessary to Preserve the Value of the Debtor's Estate**

73.     The Debtor believes that having the ability to provide the Breakup Fee and

the Expense Reimbursement to the Stalking Horse Purchaser will ensure the Debtor's

ability to maximize the realizable value of the Purchased Assets for the benefit of the

Debtor's estate, creditors and other parties-in-interest.   Approval of breakup fees and

expense reimbursements and other forms of bidding protections in connection with the

sale of significant assets pursuant to section 363 of the Bankruptcy Code has become

established practice in chapter 11 cases.   Such bidding protections enable a debtor to

ensure a sale to a contractually committed bidder at a price the debtor believes is fair,

while providing the debtor with an opportunity to enhance the value received by its estate

through an auction process.   Historically, bankruptcy courts have approved bidding

incentives similar to the Breakup Fee and the Expense Reimbursement pursuant to the

"business judgment rule."   *See e.g., Official Comm. of Subordinated Bondholders v.

Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992); *In re

995 Fifth Ave. Assocs.*, L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

74.     The United States Court of Appeals for the Third Circuit, however, has

established standards for determining the propriety of bidding incentives in the

bankruptcy context. *In re Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999); *see also In re Reliant Energy Channelview LP*, 594 F.3d 200 (3d Cir. 2010). The Court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some postpetition benefit to the debtor's estate. *See O'Brien* 181 F.3d at 533. The Third Circuit defined at least two instances in which bidding incentives may benefit the estate. First a breakup fee or expense reimbursement may be necessary to preserve the value of the estate if the assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *O'Brien*, 181 F.3d at 537. Second, if the availability of breakup fees and expenses were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. Id.

75.     The Breakup Fee and Expense Reimbursement are reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been expended by the Stalking Horse Purchaser. The Debtor believes that the Breakup Fee and Expense Reimbursement promote competitive bidding and was necessary to induce the bid from the Stalking Horse Purchaser (as well as the provision of debtor-in-possession financing). The Debtor's ability to offer the Breakup Fee and Expense Reimbursement enables it to promote a sale of the Purchased Assets with the greatest benefit to the estate.

Moreover, the Breakup Fee and Expense Reimbursement will not diminish the estate. The Debtor does not intend to terminate the Stalking Horse Agreement if to do so would incur an obligation to pay the Breakup Fee and Expense Reimbursement, unless to accept an alternative bid, which bid must exceed the consideration offered by the Stalking Horse Purchaser by an amount sufficient to pay the Breakup Fee and Expense Reimbursement.

76.    This Court has approved protections similar to the Breakup Fee and Expense Reimbursement as reasonable and consistent with the type and range of bidding protection typically approved.  *See, e.g., In re Dendreon Corp.*, Case No. 14-12515 (PJW) (Bankr. D. Del. Dec. 17, 2014) (approving breakup fee and expense reimbursement); *In re Savient Pharm., Inc.*, Case No. 13-12680 (MFW) (Bankr. D. Del. Nov. 4, 2013)(approving breakup fee and expense reimbursement); *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS) (Bankr. D. Del. May 13, 2013) (approving breakup fee and expense reimbursement); *In re ICL Holding Co., Inc.*, Case No. 12-13319 (KG) (Bankr. D. Del. Jan. 25, 2013) (authorizing stalking horse expense reimbursement); *In re Magic Brands, LLC*, Case No. 10-11310 (BLS) (Bankr. D. Del. May 18, 2010) (authorizing stalking horse expense reimbursement); *In re Vertis Holdings, Inc.*, Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (approving breakup fee and expense reimbursement).[5]

**D.    The Sale of the Debtor's Assets Should Be Free and Clear of Liens and Claims Pursuant to Section 363(f) of the Bankruptcy Code**

77.    Pursuant to, and to the fullest extent permitted by, section 363(f) of the Bankruptcy Code, the Debtor seeks authority to sell and transfer the Debtor's right,

---

[5]    Because of the voluminous nature of the orders cited herein, they are not attached to this Motion. Copies of these orders, however, are available on request.

interest and title in the Purchased Assets to the Stalking Horse Purchaser or Successful Bidder free and clear of all liens, claims, encumbrances and other interests, with such liens, claims, encumbrances and other interests to attach to the Proceeds of the Sale, subject to any rights and defenses of the Debtor and other parties-in-interest with respect thereto.  Under section 363(f) of the Bankruptcy Code, a debtor may sell all or part of its property free and clear of any and all liens, claims, encumbrances and other interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept monetary satisfaction for such interest.  11 U.S.C. § 363(f); *see also Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) is written in the disjunctive and that a court may approve a sale "free and clear" provided at least one of the requirements is met).

78.    With respect to each creditor asserting a Lien or Claim, the Debtor believes that one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.

79.    A sale free and clear of Liens and Claims is necessary to maximize the value of the Purchased Assets.  The Stalking Horse Purchaser would not consummate the Sale absent the ability to purchase the Purchased Assets free and clear of all Liens and Claims (except for Assumed Liabilities).  A sale of the Purchased Assets other than one free and clear of all Liens and Claims would yield substantially less value for the

Debtor's estate, with less certainty than the transaction proposed by the Sale.  Thus, the Sale is in the best interests of the Debtor, its estate and creditors, and all other parties-in-interest.

80.    Moreover, Courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  *See, e.g., In re Trans World Airlines, Inc.*, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).  Approving the Sale free and clear of all adverse interests is warranted.

## E.    The Assumption and Assignment of the Assigned Contracts Should Be Authorized

81.    Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports such assumption or rejection.  *See, e.g., In re Stable Mews Assoc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  *See Group of Institutional Investors v. Chicago M. St., P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel*, 872 F.2d at 39-40.

82.    The business judgment test "requires only that the trustee demonstrate that [assumption or] rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845,

846 (Bankr. W.D. Pa. 1987) (*quoting Stable Mews*, 41 B.R. at 596).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract or lease, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default.  11 U.S.C. § 365(b)(1).

83.    The debtor may elect to assign a properly assumed executory contract or lease if adequate assurance of future performance is provided.  11 U.S.C. 365(f)(2); *see L.R.S.C. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.)*, 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *Leonard v. General Motors Corp. (In re Headquarters Dodge, Inc.)*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist a trustee in realizing the full value of the debtor's assets).

84.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992); *see also In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).  Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

85.     To the extent any defaults exist under any Assigned Contract, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.  If necessary, the Debtor will submit facts prior to or at the Sale Hearing to show the financial credibility of the Stalking Horse Purchaser or Successful Bidder, as the case may be, and willingness and ability to perform under the Assigned Contracts.  The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Purchaser or Successful Bidder, as the case may be, to provide adequate assurance of future performance under the Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

86.     In addition, the Debtor submits that it is an exercise of its sound business judgment to assume and assign, as the case may be, the Assigned Contracts to the Stalking Horse Purchaser or Successful Bidder, as the case may be, in connection with the consummation of the Sale, and that the assumption and assignment of the Assigned Contracts is in the best interests of the Debtor, its estate, its creditors, and all parties-in-interest.  The Assigned Contracts being assigned to the Stalking Horse Purchaser (or Successful Bidder) are an integral part of the Purchased Assets being acquired by the Stalking Horse Purchaser (or Successful Bidder), and such assumption and assignment is reasonable and will enhance the value of the Debtor's estate.  The Court should therefore authorize the Debtor to assume and assign the Assigned Contracts.

87.     The Debtor further submits that the Assumption and Assignment Procedures, including the form of Cure Notice attached as **Exhibit 4** to the Bidding Procedures Order, are appropriate and reasonably tailored to provide counterparties to the

Assigned Contracts with adequate notice of the proposed assumption and assignment as well as proposed Cure Costs, if any.  The Debtor believes that implementation of the Assumption and Assignment Procedures is appropriate under the circumstances and should be approved.

**F.      The Secured Parties Should be Allowed to Credit Bid**

88.    In connection with the Bidding Procedures, the Debtor is proposing that the Stalking Horse Purchaser will credit bid $11.7 million comprised of (x) the amount outstanding under the DIP Credit Agreement at the time of closing, plus (y) the amount of the Secured Loan totaling $2,272,000, plus (z) such amount of Senior Notes necessary to total, when combined with the credit bid amounts from clauses (x) and (y), $11.7 million, for the purchase of the Purchased Assets.  The Debtor is proposing that no other secured creditor may credit bid its secured indebtedness, if any.

89.    The Debtor seeks confirmation of the rights of the Stalking Horse Purchaser to credit bid.  Confirmation of rights of the Stalking Horse Purchaser to credit bid is consistent with section 105(a) and section 363(k) of the Bankruptcy Code.  That statute provides as follow:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

90.    Under section 363(k), a secured creditor is entitled to bid an amount up to its entire claim; the "offset" (*i.e.*, credit) is not limited to the value of the collateral.  *See, e.g., In re Submicron Sys. Corp.*, 432 F.3d 448, 459 (3d Cir. 2006) ("It is well settled

among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)"); *In re Suncruz Casinos, LLC*, 298 B.R. 833, 839 (Bankr. S.D. Fla. 2003) ("The plain language of [section 363(k)] makes clear that the secured creditor may credit bid its *entire claim*, including any unsecured deficiency portion thereof.") (emphasis in original); *In re Morgan House Gen. P'Ship*, 1997 U.S. Dist. LEXIS 1306 at *1 (E.D. Pa. 1997); *In re Realty Invs., Ltd. V*, 72 B.R. 143, 146 (Bankr. C.D. Cal. 1987); *Criimi Mae Servs. Ltd. P'ship v. WDH Howell, LLC (In re WDH Howell, LLC)*, 298 B.R. 527, 532 n.8 (D.N.J. 2003).

91.     Thus, the right to credit bid is not affected by any prior valuation of an allowed claim under section 506(a) of the Bankruptcy Code. *In re Submicron Sys. Corp.*, 432 F.3d at 461 ("§ 363 speaks to the full face value of a secured creditor's claim, not to the portion of that claim that is actually collateralized as described in § 506."); *In re Morgan House Gen. P'ship*, 1997 U.S. Dist. LEXIS 1306 at *5 (holding that creditors may bid "to the extent of their claim" under §  363(k)); *In re Midway Invs., Ltd.*, 187 B.R. 382, 391 n.12 (Bankr. S.D. Fla. 1995) ("[A] secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof") (citing legislative history).

92.     Nor is a section 506(a) valuation required before a sale pursuant to section 363(b) of the Bankruptcy Code can be approved. *In re Submicron Systems Corp.*, 432 F.3d at 461 ("*Section 363* attempts to *avoid* the complexities and inefficiencies of valuing collateral altogether by substituting the theoretically preferable mechanism of a free market sale to set the price.  The provision is premised on the notion that the market's reaction to a sale best reflects the economic realities of assets' worth.  Naturally, then,

courts are not required first to determine the assets' worth before approving such a market sale.") (emphasis in original).

### G.   Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)

93.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

94.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, commentators agree that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  *See generally* 10 *Collier on Bankruptcy* ¶ 6004.09 (15th ed. 1999).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  *Id.*

95.    Because of the potentially diminishing value of the Purchased Assets, the Debtor needs the flexibility to close this sale promptly after all closing conditions have

been met or waived. The Debtor hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

96.     The Debtor reserves the right to adopt, implement, and/or waive such other, additional or existing Bidding Procedures or requirements that serves to further an orderly Auction, bid process, and to maximize value to the Debtor's estate.

### NOTICE

97.     The Debtor will provide notice of this Motion to: (a) the U.S. Trustee; (b) the creditors holding the 23 largest unsecured claims against the Debtor's estate, as identified in the Debtor's chapter 11 petition; (c) the Debtor's prepetition secured lenders; (d) counsel for the Crius Solar Fulfillment, LLC; (e) and the parties requesting notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. In light of the nature of the relief requested in this Application, the Debtor respectfully submits that no further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

**CONCLUSION**

WHEREFORE, the Debtor respectfully requests that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed orders attached hereto; and (iii) grant such other relief as it deems just and proper.

Dated: September 23, 2016
       Wilmington, Delaware                    BAYARD, P.A.

                                               */s/ Scott D. Cousins*
                                               Scott D. Cousins (No. 3079)
                                               Evan T. Miller (No. 5364)
                                               222 Delaware Avenue, Suite 900
                                               Wilmington, Delaware 19801
                                               Phone: (302) 655-5000
                                               Facsimile: (302) 658-6395
                                               Email: scousins@bayardlaw.com
                                                       emiller@bayardlaw.com

                                               *Proposed Attorneys for Debtor*
                                               *and Debtor-in-Possession*